# ULLMANN *v.* UNITED STATES.

No. 58. Argued December 6, 1955.—Decided March 26, 1956.

*Leonard B. Boudin* argued the cause for petitioner. With him on the brief was *Victor Rabinowitz.*

*Charles F. Barber* argued the cause for the United States. On the brief were *Solicitor General Sobeloff,*

*Assistant Attorney General Tompkins, Oscar H. Davis, Harold D. Koffsky, B. Franklin Taylor, Jr.* and *John H. Davitt.*

*Osmond K. Fraenkel* filed a brief for the National Lawyers Guild, as *amicus curiae,* supporting petitioner.

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

On November 10, 1954, the United States Attorney for the Southern District of New York filed an application under the Immunity Act of 1954, 68 Stat. 745, 18 U. S. C. (Supp. II) § 3486, for an order requiring petitioner to testify before a grand jury. The Immunity Act, in its pertinent portions, provides:

"(c) Whenever in the judgment of a United States attorney the testimony of any witness, or the production of books, papers, or other evidence by any witness, in any case or proceeding before any grand jury or court of the United States involving any interference with or endangering of, or any plans or attempts to interfere with or endanger, the national security or defense of the United States by treason, sabotage, espionage, sedition, seditious conspiracy, violations of chapter 115 of title 18 of the United States Code, violations of the Internal Security Act of 1950 (64 Stat. 987), violations of the Atomic Energy Act of 1946 (60 Stat. 755), as amended, violations of sections 212 (a)(27), (28), (29) or 241 (a)(6), (7) or 313 (a) of the Immigration and Nationality Act (66 Stat. 182–186; 204–206; 240–241), and conspiracies involving any of the foregoing, is necessary to the public interest, he, upon the approval of the Attorney General, shall make application to the court that the witness shall be instructed to testify or produce evidence subject to the pro-

visions of this section, and upon order of the court such witness shall not be excused from testifying or from producing books, papers, or other evidence on the ground that the testimony or evidence required of him may tend to incriminate him or subject him to a penalty or forfeiture. But no such witness shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter, or thing concerning which he is compelled, after having claimed his privilege against self-incrimination, to testify or produce evidence, nor shall testimony so compelled be used as evidence in any criminal proceeding (except prosecution described in subsection (d) hereof) against him in any court.

"(d) No witness shall be exempt under the provision of this section from prosecution for perjury or contempt committed while giving testimony or producing evidence under compulsion as provided in this section."

In his application the United States Attorney alleged the following facts. On November 3, 1954, petitioner, pursuant to subpoena, appeared before a duly constituted grand jury of the Southern District of New York which was investigating matters concerned with attempts to endanger the national security by espionage and conspiracy to commit espionage. The grand jury asked him a series of questions relating to his knowledge of such activities, to his and other persons' participation in such activities, and to his and other persons' membership in the Communist Party. Petitioner, invoking the privilege against self-incrimination, refused to answer the questions. The United States Attorney also asserted that he deemed the testimony necessary to the public interest of the United States, and annexed a letter from the Attorney General of the United States approving the applica-

tion. The United States Attorney, in compliance with a request of the district judge, filed an affidavit asserting his own good faith in filing the application.

Petitioner, contesting the application, attacked the constitutionality of the Act and urged that, if the immunity statute be held constitutional, the District Court should, in the exercise of its discretion, deny the application. He filed an affidavit setting forth in detail experiences with agents of the Department of Justice and congressional investigating committees and other information in support of his plea for an exercise of discretion by the District Court. The Government in reply filed affidavits denying some of the allegations set forth in petitioner's affidavit.

On January 31, 1955, the District Court sustained the constitutionality of the statute. 128 F. Supp. 617. Its order, dated February 8, 1955, instructed petitioner "to answer the questions propounded to him before the Grand Jury and to testify and produce evidence with respect to such matters under inquiry before said Grand Jury . . . ." Petitioner appealed from this order, but the Court of Appeals for the Second Circuit dismissed the appeal on the authority of *Cobbledick* v. *United States,* 309 U. S. 323.

Petitioner again refused to answer the questions which the District Court had ordered him to answer. He was then brought before the District Court and, on stipulation that he had refused to obey the order of the court of February 8, he was convicted of contempt and sentenced to six months' imprisonment unless he should purge himself of the contempt. Petitioner appealed to the Court of Appeals for the Second Circuit which affirmed the judgment of the District Court. 221 F. 2d 760. The importance of the questions at issue, in view of the differences between the legislation sustained in *Brown* v. *Walker,* 161 U. S. 591, and the Act under review, led us to bring the case here. 349 U. S. 951.

Four major questions are raised by this appeal: Is the immunity provided by the Act sufficiently broad to displace the protection afforded by the privilege against self-incrimination? Assuming that the statutory requirements are met, does the Act give the district judge discretion to deny an application for an order requiring a witness to answer relevant questions put by the grand jury, and, if so, is the court thereby required to exercise a function that is not an exercise of "judicial Power"? Did Congress provide immunity from state prosecution for crime, and, if so, is it empowered to do so? Does the Fifth Amendment prohibit compulsion of what would otherwise be self-incriminating testimony no matter what the scope of the immunity statute?

It is relevant to define explicitly the spirit in which the Fifth Amendment's privilege against self-incrimination should be approached. This command of the Fifth Amendment ("nor shall any person . . . be compelled in any criminal case to be a witness against himself . . . .") registers an important advance in the development of our liberty—"one of the great landmarks in man's struggle to make himself civilized." [1] Time has not shown that protection from the evils against which this safeguard was directed is needless or unwarranted. This constitutional protection must not be interpreted in a hostile or niggardly spirit. Too many, even those who should be better advised, view this privilege as a shelter for wrongdoers. They too readily assume that those who invoke it are either guilty of crime or commit perjury in claiming the privilege. [2] Such a view does scant honor

---

[1] Griswold, The Fifth Amendment Today (1955), 7.

[2] Father John Fearon, O. P., has addressed himself to this misapprehension: "What is to be said of the opinion that an innocent man has an obligation in conscience not to have recourse to the Fifth Amendment? Since the natural law does not provide explicitly for this circumstance moral obligation has to be determined

to the patriots who sponsored the Bill of Rights as a condition to acceptance of the Constitution by the ratifying States. The Founders of the Nation were not naive or disregardful of the interests of justice. The difference between them and those who deem the privilege an obstruction to due inquiry has been appropriately indicated by Chief Judge Magruder:

"Our forefathers, when they wrote this provision into the Fifth Amendment of the Constitution, had in mind a lot of history which has been largely forgotten to-day. See VIII Wigmore on Evidence (3d ed. 1940) § 2250 et seq.; Morgan, The Privilege Against Self-Incrimination, 34 Minn. L. Rev. 1 (1949). They made a judgment and expressed it in our fundamental law, that it were better for an occasional crime to go unpunished than that the prosecution should be free to build up a criminal case, in whole or in part, with the assistance of enforced disclosures by the accused. The privilege against self-incrimination serves as a protection to the innocent as well as to the guilty, and we have been admonished that it should be given a liberal application. Hoffman v. United States, . . . 341 U. S. 479, 486 . . . . If it be thought that the privilege is outmoded in the conditions of this modern

by civil law. Actually the determination of civil law is quite clear: the innocent and guilty alike have a right of recourse to the Fifth Amendment. And if the innocent man has a clearly defined right to such recourse it is inconceivable that he could simultaneously have a duty not to have recourse, since rights and duties are correlative. Nor can it be urged that non-recourse is a duty of piety rather than justice. If such an opinion were binding and all innocent men waived their rights to the protection of the Fifth Amendment, the purpose of the law would be defeated and the common welfare of the nation would suffer rather than prosper." Congressional Investigations and Moral Theology, The Commonweal, Feb. 19, 1954, 497, 499.

age, then the thing to do is to take it out of the Constitution, not to whittle it down by the subtle encroachments of judicial opinion." *Maffie* v. *United States,* 209 F. 2d 225, 227.

Nothing new can be put into the Constitution except through the amendatory process. Nothing old can be taken out without the same process.

No doubt the constitutional privilege may, on occasion, save a guilty man from his just deserts. It was aimed at a more far-reaching evil—a recurrence of the Inquisition and the Star Chamber, even if not in their stark brutality. Prevention of the greater evil was deemed of more importance than occurrence of the lesser evil. Having had much experience with a tendency in human nature to abuse power, the Founders sought to close the doors against like future abuses by law-enforcing agencies.

As no constitutional guarantee enjoys preference, so none should suffer subordination or deletion. It is appropriate to read the conviction expressed in a memorable address by Senator Albert J. Beveridge to the American Bar Association in 1920, a time when there was also manifested impatience with some of the restrictions of the Constitution in the presumed interest of security. His appeal was to the Constitution—to the whole Constitution, not to a mutilating selection of those parts only which for the moment find favor.[3] To view a particular

---

[3] "If liberty is worth keeping and free representative government worth saving, we must stand for *all* American fundamentals—not some, but all. All are woven into the great fabric of our national well-being. We cannot hold fast to some only, and abandon others that, for the moment, we find inconvenient. If one American fundamental is prostrated, others in the end will surely fall. The success or failure of the American theory of society and government, depends upon our fidelity to every one of those inter-dependent parts of that immortal charter of orderly freedom, the Constitution of the United States." Beveridge, The Assault upon American Fundamentals, 45 Reports of American Bar Assn., 188, 216 (1920).

provision of the Bill of Rights with disfavor inevitably results in a constricted application of it. This is to disrespect the Constitution.

It is in this spirit of strict, not lax, observance of the constitutional protection of the individual that we approach the claims made by petitioner in this case. The attack on the Immunity Act as violating the Fifth Amendment is not a new one. Sixty years ago this Court considered, in *Brown* v. *Walker,* 161 U. S. 591, the constitutionality of a similar Act, the Act of February 11, 1893, 27 Stat. 443.[4] In that case, Brown, auditor for a railroad company, had been subpoenaed to testify before a grand jury which was investigating charges that officers and agents of the company had violated the Interstate Commerce Act. Invoking the privilege against self-incrimination, he refused to answer certain questions concerning the operations and the rebate policy of the railroad. On an order to show cause before the United States District Court for the Western District of Pennsylvania, he was adjudged in contempt. His petition for a writ of habeas corpus to the Circuit Court for the Western Dis-

---

[4] ". . . no person shall be excused from attending and testifying or from producing books, papers, tariffs, contracts, agreements and documents before the Interstate Commerce Commission, or in obedience to the subpoena of the Commission . . . or in any cause or proceeding, criminal or otherwise, based upon or growing out of any alleged violation of the act of Congress, entitled, 'An act to regulate commerce,' . . . on the ground or for the reason that the testimony or evidence, documentary or otherwise, required of him, may tend to criminate him or subject him to a penalty or forfeiture. But no person shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing, concerning which he may testify, or produce evidence, documentary or otherwise, before said Commission, or in obedience to its subpoena . . . or in any such case or proceeding: *Provided,* That no person so testifying shall be exempt from prosecution and punishment for perjury committed in so testifying."

trict of Pennsylvania was dismissed. Petitioner appealed to this Court, urging that the 1893 immunity statute was unconstitutional.

The Court considered and rejected petitioner's arguments, holding that a statute which compelled testimony but secured the witness against a criminal prosecution which might be aided directly or indirectly by his disclosures did not violate the Fifth Amendment's privilege against self-incrimination and that the 1893 statute did provide such immunity. "While the constitutional provision in question is justly regarded as one of the most valuable prerogatives of the citizen, its object is fully accomplished by the statutory immunity, and we are, therefore, of opinion that the witness was compellable to answer . . . ." 161 U. S., at 610.[5]

Petitioner, however, attempts to distinguish *Brown* v. *Walker*. He argues that this case is different from *Brown* v. *Walker* because the impact of the disabilities imposed by federal and state authorities and the public in general—such as loss of job, expulsion from labor unions, state registration and investigation statutes, passport eligibility, and general public opprobrium—is so oppressive that the statute does not give him true immunity. This, he alleges, is significantly different from the impact of testifying on the auditor in *Brown* v. *Walker,* who could the next day resume his job with reputation unaffected.[6] But, as this Court has often held,

---

[5] Shiras, J., joined by Gray and White, JJ., and Field, J., dissented.

[6] It is true that the Court in *Brown* v. *Walker* stated: ". . . it is entirely clear that he was not the chief or even a substantial offender against the law, and that his privilege was claimed for the purpose of shielding the railway or its officers from answering a charge of having violated its provisions. To say that, notwithstanding his immunity from punishment, he would incur personal odium and disgrace from answering these questions, seems too much like an abuse of language to be worthy of serious consideration." 161 U. S.,

the immunity granted need only remove those sanctions which generate the fear justifying invocation of the privilege: "The interdiction of the Fifth Amendment operates only where a witness is asked to incriminate himself—in other words, to give testimony which may possibly expose him to a criminal charge. But if the criminality has already been taken away, the Amendment ceases to apply." *Hale* v. *Henkel,* 201 U. S. 43, 67. Here, since the Immunity Act protects a witness who is compelled to answer to the extent of his constitutional immunity, he has of course, when a particular sanction is sought to be imposed against him, the right to claim that it is criminal in nature.

Again, the petitioner seeks to distinguish this case from *Brown* v. *Walker* by claiming that under the Immunity Act of 1954 the district judge to whom the United States Attorney must apply for an order instructing him to testify has discretion in granting the order and thus has discretion in granting the immunity which automatically follows from the order. Petitioner cites the language of the statute, the legislative history, and miscellaneous other authorities in support of his construction. The Government contends that the court has no discretion to determine whether the public interest would best be served by exchanging immunity from prosecution for testimony, that its only function is to order a witness to testify if it determines that the case is within the framework of the statute.

We are concerned here only with § (c) and therefore need not pass on this question with respect to §§ (a) and

at 609–610. The Court, however, concluded: "But, even if this were true, under the authorities above cited, he would still be compelled to answer, if the facts sought to be elucidated were material to the issue." *Id.,* at 610. For a fuller exposition, see *id.,* at 605–606.

(b) of the Act.[7]   A fair reading of § (c) does not indicate that the district judge has any discretion to deny the order on the ground that the public interest does not

---

[7] "(a) In the course of any investigation relating to any interference with or endangering of, or any plans or attempts to interfere with or endanger the national security or defense of the United States by treason, sabotage, espionage, sedition, seditious conspiracy or the overthrow of its Government by force or violence, no witness shall be excused from testifying or from producing books, papers, or other evidence before either House, or before any committee of either House, or before any joint committee of the two Houses of Congress on the ground that the testimony or evidence required of him may tend to incriminate him or subject him to a penalty or forfeiture, when the record shows that—

"(1) in the case of proceedings before one of the Houses of Congress, that a majority of the members present of that House; or

"(2) in the case of proceedings before a committee, that two-thirds of the members of the full committee shall by affirmative vote have authorized such witness to be granted immunity under this section with respect to the transactions, matters, or things concerning which he is compelled, after having claimed his privilege against self-incrimination to testify or produce evidence by direction of the presiding officer and

"that an order of the United States district court for the district wherein the inquiry is being carried on has been entered into the record requiring said person to testify or produce evidence.  Such an order may be issued by a United States district court judge upon application by a duly authorized representative of the Congress or of the committee concerned.  But no such witness shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter, or thing concerning which he is so compelled, after having claimed his privilege against self-incrimination, to testify or produce evidence, nor shall testimony so compelled be used as evidence in any criminal proceeding (except prosecutions described in subsection (d) hereof) against him in any court.

"(b) Neither House nor any committee thereof nor any joint committee of the two Houses of Congress shall grant immunity to any witness without first having notified the Attorney General of the United States of such action and thereafter having secured the approval of the United States district court for the district wherein such inquiry is being held.  The Attorney General of the United

warrant it. We agree with District Judge Weinfeld's interpretation of this section: [8]

"The most that can be said for the legislative history is that it is on the whole inconclusive. Certainly, it contains nothing that requires the court to reject the construction which the statutory language clearly requires. Especially is this so where the construction contended for purports to raise a serious constitutional question as to the role of the judiciary under the doctrine of separation of powers. The Supreme Court has repeatedly warned 'if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.' [9] Indeed, the Court has stated that words may be strained 'in the candid service of avoiding a serious constitutional doubt.' [10] Here there is no need to strain words. It requires neither torturing of language nor disregard of a clear legislative policy [11] to avoid the constitutional question advanced by the witness. Indeed, to reach the constitutional issue would require straining of language. In such circumstances the court's duty is plainly to avoid the constitutional question." 128 F. Supp., at 627–628.

States shall be notified of the time of each proposed application to the United States district court and shall be given the opportunity to be heard with respect thereto prior to the entrance into the record of the order of the district court."

[8] The footnotes in the district judge's opinion have been renumbered.

[9] "Crowell v. Benson, 285 U. S. 22, 62 . . . United States v. Rumely, 345 U. S. 41, 45 . . . United States v. C. I. O., 335 U. S. 106 . . . Brandeis, J. concurring in Ashwander v. T. V. A., 297 U. S. 288, 341, 348 . . . and cases cited."

[10] "United States v. Rumely, 345 U. S. 41, 47 . . . ."

[11] "Cf. Shapiro v. United States, 335 U. S. 1, 31 . . . ."

Since the Court's duty under § (c) is only to ascertain whether the statutory requirements are complied with by the grand jury, the United States Attorney, and the Attorney General, we have no difficulty in concluding that the district court is confined within the scope of "judicial Power." *Interstate Commerce Commission* v. *Brimson,* 154 U. S. 447.

Petitioner further argues that the immunity is not constitutionally sufficient so long as a witness is subject to the very real possibility of state prosecution. He urges that the statute does not, and constitutionally could not, grant such immunity. The immunity portion of the statute contains two parts. The first prohibits prosecutions and is worded virtually in the terms of the 1893 Act. The second makes explicit that the compelled testimony shall not be used against the witness in any proceeding in any court. Such a clause was construed in *Adams* v. *Maryland,* 347 U. S. 179, to apply to state courts. In *Brown* v. *Walker,* it was urged that the prohibition against prosecution did not grant protection against prosecution in the state courts. First finding that Congress could constitutionally provide such immunity, the Court then interpreted the statute:

> "The act in question contains no suggestion that it is to be applied only to the Federal courts. It declares broadly that 'no person shall be excused from attending and testifying . . . before the Interstate Commerce Commission . . . on the ground . . . that the testimony . . . required of him may tend to criminate him,' etc. 'But no person shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing concerning which he may testify,' etc. It is not that he shall not be prosecuted for or on account of any *crime* concerning which he may testify, which might

possibly be urged to apply only to crimes under the Federal law and not to crimes, such as the passing of counterfeit money, etc., which are also cognizable under state laws; but the immunity extends to any *transaction, matter or thing* concerning which he may testify, which clearly indicates that the immunity is intended to be general, and to be applicable whenever and in whatever court such prosecution may be had." 161 U. S., at 607–608.

The Report of the Committee on the Judiciary of the House of Representatives supports the broad interpretation of the Act before us:

"Even though the power of Congress to prohibit a subsequent State prosecution is doubtful, such a constitutional question should not prevent the enactment of the recommended bill. The language of the amendment . . . is sufficiently broad to ban a subsequent State prosecution if it be determined that the Congress has the constitutional power to do so. In addition, the amendment recommended provides the additional protection—as set forth in the Adams case, by outlawing the subsequent use of the compelled testimony in any criminal proceeding—State or Federal.

"By the use of these two distinct concepts, the committee believes that the fullest protection that can be afforded the witness will be achieved." H. R. Rep. No. 2606, 83d Cong., 2d Sess. 7.

Petitioner questions the constitutional power of Congress to grant immunity from state prosecution. Congressional abolition of state power to punish crimes committed in violation of state law presents a more drastic exercise of congressional power than that which we considered in *Adams*. In that case, only the use of the compelled testimony, not prosecution itself, was pro-

hibited. Here the State is forbidden to prosecute. But it cannot be contested that Congress has power to provide for national defense and the complementary power "To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." U. S. Const., Art. I, § 8, cl. 18. The Immunity Act is concerned with the national security. It reflects a congressional policy to increase the possibility of more complete and open disclosure by removal of fear of state prosecution. We cannot say that Congress' paramount authority in safeguarding national security does not justify the restriction it has placed on the exercise of state power for the more effective exercise of conceded federal power. We have already, in the name of the Commerce Clause, upheld a similar restriction on state court jurisdiction, *Brown* v. *Walker,* 161 U. S., at 606–607, and we can find no distinction between the reach of congressional power with respect to commerce and its power with respect to national security. See also *Hines* v. *Davidowitz,* 312 U. S. 52.[12]

Petitioner also urges that if *Brown* v. *Walker* is found nondistinguishable and controlling, then that case should be reconsidered and overruled. He also urges upon us a "return" to a literal reading of the Fifth Amendment. *Brown* v. *Walker* was the second case to deal with an immunity statute. Four years previously, in *Counselman* v. *Hitchcock,* 142 U. S. 547, a unanimous Court had found

---

[12] We need not consider at this time petitioner's claim that immunity is not complete and the statute unconstitutional because he can be prosecuted later for participation in a continuing conspiracy. Congress has the power to provide, and has provided, that immunity from prosecution which the Constitution requires. See *Heike* v. *United States,* 227 U. S. 131, 142.

constitutionally inadequate the predecessor to the 1893 statute because the immunity granted was incomplete, in that it merely forbade the use of the testimony given and failed to protect a witness from future prosecution based on knowledge and sources of information obtained from the compelled testimony. It was with this background that the 1893 statute, providing complete immunity from prosecution, was passed and that *Brown* v. *Walker* was argued and decided. As in *Counselman,* appellant's numerous arguments were presented by James C. Carter, widely acknowledged as the leader of the American bar.[13] The Court was closely divided in upholding the statute, and the opinions reflect the thoroughness with which the issues were considered. Since that time the Court's holding in *Brown* v. *Walker* has never been challenged; the case and the doctrine it announced have consistently and

---

[13] He urged that the statute left the witness in a worse condition because it did not abrogate the crime for which he was given immunity; that the constitutional safeguard goes toward relieving the witness from the danger of an accusation being made against him while the statutory immunity forces him to supply evidence leading to an accusation and provides only a means for defense; that the statute puts a heavy burden on petitioner, if he is indicted, to prove that he had testified concerning the matter for which he was indicted; that a citizen is entitled to the very thing secured to him by the constitutional safeguards and not something which will probably answer the same purpose; that the statute subjects him to the infamy and disgrace from which he was protected by the constitutional safeguard; that the statute did not protect him from prosecution for a state crime; that even if it were so interpreted, Congress had no power to grant such protection; that the immunity granted was too narrow since it only extended to matters concerning which he was called to testify and not to all matters related to the testimony given; that to be able to claim the privilege the witness would virtually have to reveal his crime in order that the court could see that the statute failed to protect him; and finally that the statute was an attempt to exercise the power of pardon which was a power not delegated to Congress.

without question been treated as definitive by this Court, in opinions written, among others, by Holmes and Brandeis, JJ. See, *e. g., McCarthy* v. *Arndstein,* 266 U. S. 34, 42; *Heike* v. *United States,* 227 U. S. 131, 142. The 1893 statute has become part of our constitutional fabric and has been included "in substantially the same terms, in virtually all of the major regulatory enactments of the Federal Government." *Shapiro* v. *United States,* 335 U. S. 1, 6. For a partial list of these statutes, see, *id.,* at 6–7, n. 4. Moreover, the States, with one exception—a case decided prior to *Brown* v. *Walker*—have, under their own constitutions, enunciated the same doctrine, 8 Wigmore, Evidence (3d ed.), § 2281, and have passed numerous statutes compelling testimony in exchange for immunity in the form either of complete amnesty or of prohibition of the use of the compelled testimony. For a list of such statutes, see 8 Wigmore, Evidence (3d ed.), § 2281, n. 11 (pp. 478–501) and Pocket Supplement thereto, § 2281, n. 11 (pp. 147–157).

We are not dealing here with one of the vague, undefinable, admonitory provisions of the Constitution whose scope is inevitably addressed to changing circumstances. The privilege against self-incrimination is a specific provision of which it is peculiarly true that "a page of history is worth a volume of logic." *New York Trust Co.* v. *Eisner,* 256 U. S. 345, 349. For the history of the privilege establishes not only that it is not to be interpreted literally,[14] but also that its sole concern is, as its name indicates, with the danger to a witness forced to give testimony leading to the infliction of "penalties

---

[14] ". . . the provisions of the Constitution are not mathematical formulas having their essence in their form; they are organic living institutions transplanted from English soil. Their significance is vital not formal; it is to be gathered not simply by taking the words and a dictionary, but by considering their origin and the line of their growth." *Gompers* v. *United States,* 233 U. S. 604, 610.

affixed to the criminal acts . . . ." *Boyd* v. *United States,* 116 U. S. 616, 634. We leave *Boyd* v. *United States* unqualified, as it was left unqualified in *Brown* v. *Walker.* Immunity displaces the danger. Once the reason for the privilege ceases, the privilege ceases. We reaffirm *Brown* v. *Walker,* and in so doing we need not repeat the answers given by that case to the other points raised by petitioner.[15]

The judgment of the Court of Appeals is

*Affirmed.*

MR. JUSTICE REED concurs in the opinion and judgment of the Court except as to the statement that no consti-

---

[15] We do not discuss petitioner's argument, relying on the First Amendment, that inquiry into his political membership and associations is unconstitutional. Petitioner contends that some of the questions which he was asked are objectionable because they require testimony that is protected by the implications of the First Amendment. But it is every man's duty to give testimony before a duly constituted tribunal unless he invokes some valid legal exemption in withholding it. Although petitioner made the First Amendment argument when the United States Attorney applied, under the Immunity Act, for an order requiring him to testify, when he was cited for contempt he urged only "all of the grounds we urged before Judge Weinfeld in opposition to the statute, in support of our contention that the statute was unconstitutional. We will rest on that and proceed on that basis in the Appellate Courts." Petitioner did not make any objection to the questions other than the assertion of the unconstitutionality of the Immunity Act. It should also be noted that when petitioner—who, the record shows, was an experienced witness, had been advised by counsel especially experienced in this field, and was desirous of making this a test case—refused to answer the questions propounded before the grand jury the second time, he did not claim any privilege under the First Amendment. His counsel, by way of dispensing with the reading of the minutes of what took place before the grand jury, stated that "the reason given for his refusal was that he feared the answers might incriminate him and he pleaded his privilege under the Fifth Amendment of the Constitution."

tutional guarantee enjoys preference. *Murdock* v. *Pennsylvania,* 319 U. S. 105, 115; *Thomas* v. *Collins,* 323 U. S. 516, 530; cf. *Kovacs* v. *Cooper,* 336 U. S. 77, 88.

Mr. Justice Douglas, with whom Mr. Justice Black concurs, dissenting.

I would reverse the judgment of conviction. I would base the reversal on *Boyd* v. *United States,* 116 U. S. 616, or, in the alternative, I would overrule the five-to-four decision of *Brown* v. *Walker,* 161 U. S. 591, and adopt the view of the minority in that case that the right of silence created by the Fifth Amendment is beyond the reach of Congress.

First, as to the *Boyd* case. There are numerous disabilities created by federal law that attach to a person who is a Communist. These disabilities include ineligibility for employment in the Federal Government and in defense facilities, disqualification for a passport, the risk of internment, the risk of loss of employment as a longshoreman—to mention only a few.[1] These disabilities imposed by federal law are forfeitures within the meaning of our cases and as much protected by the Fifth

---

[1] See 64 Stat. 992, 50 U. S. C. § 784, as amended, 68 Stat. 777, 50 U. S. C. (Supp. II) § 784 (prohibition of employment in the Federal Government and in defense facilities); 64 Stat. 993, 50 U. S. C. § 785 (ineligibility for a passport); 64 Stat. 1019, 50 U. S. C. §§ 811–826 (the possibility of internment); 40 Stat. 220, as amended, 64 Stat. 427, 50 U. S. C. § 191; 33 CFR, 1955 Cum. Supp., §§ 125.01, 125.29 (possibility of loss of employment as a longshoreman). And see 68 Stat. 776, 50 U. S. C. (Supp. II) § 843. Moreover, under the Subversive Activities Control Act, 64 Stat. 987, 50 U. S. C. § 781, discussed hereafter, it is a crime for a person who is a member of a Communist organization registered under the Act to engage in certain activity, *e. g.,* to hold office or employment with any labor organization, to work for the Government or have employment in any defense facility, § 5 (a)(1), or to apply for or use a passport § 6 (a).

Amendment as criminal prosecution itself. But there is no indication that the Immunity Act, 68 Stat. 745, 18 U. S. C. (Supp. II) § 3486, grants protection against those disabilities. The majority will not say that it does. I think, indeed, that it must be read as granting only partial, not complete, immunity for the matter disclosed under compulsion. Yet, as the Court held in *Counselman* v. *Hitchcock*, 142 U. S. 547, 586, an immunity statute to be valid must "supply a complete protection from all the perils against which the constitutional prohibition was designed to guard . . . ."

*Boyd* v. *United States, supra,* involved a proceeding to establish a forfeiture of goods alleged to have been fraudulently imported without payment of duties. The claimants resisted an order requiring the production of an invoice to be used against them in the forfeiture proceedings. The Court in an opinion by Mr. Justice Bradley sustained the defense of the Fifth Amendment. The Court said, "A witness, as well as a party, is protected by the law from being compelled to give evidence that tends to criminate him, or to subject his property to forfeiture." 116 U. S., at 638. And see *Lees* v. *United States,* 150 U. S. 476. The contrary holding was deemed hostile to the spirit of our institutions:

> ". . . any compulsory discovery by extorting the party's oath, or compelling the production of his private books and papers, to convict him of crime, or to forfeit his property, is contrary to the principles of a free government. It is abhorrent to the instincts of an Englishman; it is abhorrent to the instincts of an American. It may suit the purposes of despotic power; but it cannot abide the pure atmosphere of political liberty and personal freedom." 116 U. S., at 631–632.

The forfeiture of property on compelled testimony is no more abhorrent than the forfeiture of rights of citizenship. Any forfeiture of rights as a result of compelled testimony is at war with the Fifth Amendment.

The Court apparently distinguishes the *Boyd* case on the ground that the forfeiture of property was a penalty affixed to a criminal act. The loss of a job and the ineligibility for a passport are also penalties affixed to a criminal act. For the case of *Dennis* v. *United States,* 341 U. S. 494, makes plain that membership in the Communist Party is a crucial link of evidence for conviction under the Smith Act, 54 Stat. 671, as amended, 62 Stat. 808, 18 U. S. C. § 2385. And see *Blau* v. *United States,* 340 U. S. 159. When a man loses a job because he is a Communist, there is as much a penalty suffered as when an importer loses property because he is a tax evader. When a man loses his right to a passport because he is a Communist, there is as much a penalty suffered as when property is lost for violation of the revenue laws. If there was a penalty suffered in the *Boyd* case, there are penalties suffered here. Both are hitched to criminal acts. And the Constitution places the property rights involved in the *Boyd* case no higher than the rights of citizenship involved here.

The Court may mean that if disqualification for government employment or ineligibility for a passport is a forfeiture within the meaning of the *Boyd* case, Congress has lifted these disabilities in exchange for the witness' testimony. Congress, I think, will be surprised to hear this. There is nothing in the legislative history that would suggest that Congress was willing to pay any such price for the testimony. If the disabilities which attach under existing law are forfeitures, the Court should strike down the Act. If Congress chooses to enact a new Immunity Act broad enough to protect against all forfeitures, it is free to do so. The Court seems to commit

Congress to a policy that there is no indication Congress favors.

We should apply the principle of the *Boyd* case to the present one and hold that since there is no protection in the Immunity Act against loss of rights of citizenship, the immunity granted is less than the protection afforded by the Constitution. Certainly personal freedom has at least as much constitutional dignity as property.

Second, as to *Brown* v. *Walker*. The difficulty I have with that decision and with the majority of the Court in the present case is that they add an important qualification to the Fifth Amendment. The guarantee is that no person "shall be compelled in any criminal case to be a witness against himself." The majority does not enforce that guarantee as written but qualifies it; and the qualification apparently reads, "but only if criminal conviction might result." Wisely or not, the Fifth Amendment protects against the compulsory self-accusation of crime without exception or qualification. In *Counselman* v. *Hitchcock, supra,* at 562, Mr. Justice Blatchford said, "The privilege is limited to criminal matters, but it is as broad as the mischief against which it seeks to guard."

The "mischief" to be prevented falls under at least three heads.

(1) One "mischief" is not only the risk of conviction but the risk of prosecution. Mr. Justice Shiras, one of the four dissenters in *Brown* v. *Walker*, alluded to this difficulty when he declared that the immunity statute involved in that case was unconstitutional:

"... all that can be said is, that the witness is *not* protected, by the provision in question, from being *prosecuted,* but that he has been furnished with a good plea to the indictment, which will secure his acquittal. But is that true? Not unless the plea is sustained by competent evidence. His condition,

then, is that he has been prosecuted, been compelled, presumably, to furnish bail, and put to the trouble and expense of employing counsel and furnishing the evidence to make good his plea." 161 U. S., at 621.

The risk of prosecution is not a risk which the wise take lightly. As experienced a judge as Learned Hand once said, "I must say that, as a litigant, I should dread a lawsuit beyond almost anything else short of sickness and of death." See Frank, Courts on Trial (1949), 40. A part of the dread in a case such as this is the chain of events that may be put in motion once disclosure is made. The truth is, I think, that there is no control left, once the right of secrecy is broken. For the statute protects the accused only on account of the "transaction, matter, or thing" concerning which he is compelled to testify and bars the use as evidence of the "testimony so compelled." The forced disclosure may open up vast new vistas for the prosecutor with leads to numerous accusations not within the purview of the question and answer. What related offenses may be disclosed by leads furnished by the confession? How remote need the offense be before the immunity ceases to protect it? How much litigation will it take to determine it? What will be the reaction of the highest court when the facts of the case reach it?

It is, for example, a crime for a person who is a member of a Communist organization registered under the Subversive Activities Control Act, 64 Stat. 987, 50 U. S. C. § 781, to be employed by the United States, to be employed in any defense facility, to hold office or employment with any labor organization, § 5 (a)(1), or to apply for a passport or to use a passport. § 6 (a). The crime under that Act is the application for a passport, the use of a passport, or employment by one of the named agencies, as the case may be. Are those crimes included within

the "transaction, matter, or thing" protected by the Immunity Act?

The Taft-Hartley Act, 61 Stat. 146, 29 U. S. C. § 159 (h), requires officers of labor organizations to file non-Communist affidavits as a condition to the exercise by the National Labor Relations Board of its power to make investigations or to issue complaints. A witness before a grand jury or congressional committee is compelled under the force of the Immunity Act to testify. He testifies that he is not a member of the Communist Party. He then files an affidavit under the Taft-Hartley Act to that effect. May he be prosecuted for filing a false affidavit?

These are real and dread uncertainties that the Immunity Act does not remove. They emphasize that one protective function of the Fifth Amendment is at once removed when the guarantee against self-incrimination is qualified in the manner it is today.

The Court leaves all those uncertainties to another day, saying that the immunity granted by Congress will extend to its constitutional limits and that those constitutional limits will be determined case by case in future litigation. That means that no one knows what the limits are. The Court will not say. Only litigation on a distant day can determine it.

The concession of the Court underlines my point. It shows that the privilege of silence is exchanged for a partial, undefined, vague immunity. It means that Congress has granted far less than it has taken away.

(2) The guarantee against self-incrimination contained in the Fifth Amendment is not only a protection against conviction and prosecution but a safeguard of conscience and human dignity and freedom of expression as well. My view is that the Framers put it beyond the power of Congress to *compel* anyone to confess his crimes. The evil to be guarded against was partly self-accusation

under legal compulsion. But that was only a part of the evil. The conscience and dignity of man were also involved. So too was his right to freedom of expression guaranteed by the First Amendment.[2] The Framers, therefore, created the federally protected right of silence and decreed that the law could not be used to pry open one's lips and make him a witness against himself.

A long history and a deep sentiment lay behind this decision. Some of those who came to these shores were Puritans who had known the hated oath *ex officio* used both by the Star Chamber and the High Commission. See Maguire, Attack of the Common Lawyers on the Oath *Ex Officio* as Administered in the Ecclesiastical Courts in England, Essays in History and Political Theory (1936), c. VII. They had known the great rebellion of Lilburn, Cartwright and others against those instruments of oppression. Cartwright had refused to take the oath *ex officio* before the High Commission on the grounds that "hee thought he was not bound by the lawes of God so to doe." Pearson, Thomas Cartwright and Elizabethan Puritanism 1535–1603 (1925), 318. Lilburn marshalled many arguments against the oath *ex officio,* one of them being the sanctity of conscience and the dignity of man before God:

> "as for that Oath that was put upon me, I did refuse to take it as a sinful and unlawful oath, and by the strength of my God enabling me, I will never take it, though I be pulled in pieces by wild horses, as

---

[2] The impact of public identification on First Amendment freedoms was acknowledged by Chief Justice Vinson in *American Communications Assn.* v. *Douds,* 339 U. S. 382, 402, where he said: "Under some circumstances, indirect 'discouragements' undoubtedly have the same coercive effect upon the exercise of First Amendment rights as imprisonment, fines, injunctions or taxes. A requirement that adherents of particular religious faiths or political parties wear identifying arm-bands, for example, is obviously of this nature."

the antient Christians were by the bloody tyrants in the Primitive Church; neither shall I think that man a faithful subject of Christ's kingdom, that shall at any time hereafter take it, seeing the wickedness of it hath been so apparently laid open by so many, for the refusal whereof many do suffer cruel persecution to this day." The Trial of Lilburn and Wharton, 3 How. St. Tr. 1315, 1332.

The literature of the Levellers, of whom Lilburn was a leader, abounds in this attitude. In 1648, there was published a Declaration in the form of a petition, item 12 of which reads:

"That all Statutes for all kinds of Oaths, whether in Corporations, Cities, or other, which insnare conscientious people, as also other Statutes, injoyning all to hear the Book of Common Prayer, be forthwith repealed and nulled, and that nothing be imposed upon the consciences of any to compel them to sin against their own consciences." Haller & Davies, The Leveller Tracts 1647–1653 (1944), 112.

In 1653, Lilburn published The Just Defence in which he wrote:

"Another fundamental right I then contended for, was, that no mans conscience ought to be racked by oaths imposed, to answer to questions concerning himself in matters criminal, or pretended to be so." Haller & Davies, *id.*, at 454.

These are important declarations, as they throw light on the meaning of "compelled" as used in the Fifth Amendment.

The amending process that brought the Fifth Amendment into the Constitution is of little aid in our problem of interpretation. But there are indications in the debates on the Constitution that the evil to be remedied was the use of torture to exact confessions. See, *e. g.,*

Virginia Debates (2d ed. 1805), 221, 320–321; 2 Elliot's Debates (2d ed. 1876), 111. It was, indeed, the condemnation of torture to exact confessions that was written into the early law of the American Colonies. Article 45 of the Massachusetts Body of Liberties of 1641 provided in part, "No man shall be forced by Torture to confesse any Crime against himselfe nor any other . . . ." Connecticut adopted a similar provision. Laws of Connecticut Colony (1865 ed.), 65. Virginia soon followed suit: ". . . noe law can compell a man to sweare against himselfe in any matter wherein he is lyable to corporall punishment." Hening, Statutes at Large, Vol. II, 422.

The compulsion outlawed was moral compulsion as well as physical compulsion. An episode in the administration of Governor William Bradford of the Plymouth Plantation illustrates the point. He sought advice from his ministers asking, "How farr a magistrate may extracte a confession from a delinquente, to acuse him selfe of a capitall crime . . . ." The three ministers—Ralph Partrich, John Reynor, and Charles Chancy—were unanimous in concluding that the oath was against both the laws of God and the laws of man. Partrich's answer is typical:

> "[The magistrate] may not extracte a confession of a capitall crime from a suspected person by any violent means, whether it be by an oath imposed, or by any punishmente inflicted or threatened to be inflicted." Bradford, History of Plymouth Plantation, Mass. Hist. Soc. Coll. Ser. 4, Vol. III, 390–391.

And see Griswold, The Fifth Amendment Today (1955), 4; Morgan, The Privilege Against Self Incrimination, 34 Minn. L. Rev. 1, 22; Pittman, The Colonial and Constitutional History of the Privilege Against Self-Incrimination in America, 21 Va. L. Rev. 763, 769.

The Court, by forgetting that history, robs the Fifth Amendment of one of the great purposes it was designed

to serve. To repeat, the Fifth Amendment was written in part to prevent any Congress, any court, and any prosecutor from prying open the lips of an accused to make incriminating statements against his will. The Fifth Amendment protects the conscience and the dignity of the individual, as well as his safety and security, against the compulsion of government.[3]

(3) This right of silence, this right of the accused to stand mute serves another high purpose. Mr. Justice Field, one of the four dissenters in *Brown* v. *Walker,* stated that it is the aim of the Fifth Amendment to protect the accused from all compulsory testimony "which would expose him to infamy and disgrace," as well as that which might lead to a criminal conviction. 161 U. S., at 631. One of the most powerful opinions in the books maintaining that thesis is by Judge Peter S. Grosscup in *United States* v. *James,* 60 F. 257, involving the same Immunity Act as the one involved in *Brown* v. *Walker.* Judge Grosscup reviewed the history of the reign of intolerance that once ruled England, the contests between Church and State, and the cruelties of the old legal procedures. Judge Grosscup said concerning the aim of the Framers in drafting the Fifth Amendment (*id.,* at 264):

"Did they originate such privilege simply to safeguard themselves against the law-inflicted penalties

---

[3] Dean Erwin N. Griswold of Harvard recently wrote:

"Where matters of a man's belief or opinions or political views are essential elements in the charge, it may be most difficult to get evidence from sources other than the suspected or accused person himself. Hence, the significance of the privilege over the years has perhaps been greatest in connection with resistance to prosecution for such offenses as heresy or political crimes. In these areas the privilege against self-incrimination has been a protection for freedom of thought and a hindrance to any government which might wish to prosecute for thoughts and opinions alone." The Fifth Amendment Today, *supra,* 8–9.

and forfeitures? Did they take no thought of the pains of practical outlawry? The stated penalties and forfeitures of the law might be set aside; but was there no pain in disfavor and odium among neighbors, in excommunication from church or societies that might be governed by the prevailing views, in the private liabilities that the law might authorize, or in the unfathomable disgrace, not susceptible of formulation in language, which a known violation of law brings upon the offender? Then, too, if the immunity was only against the law-inflicted pains and penalties, the government could probe the secrets of every conversation, or society, by extending compulsory pardon to one of its participants, and thus turn him into an involuntary informer. Did the framers contemplate that this privilege of silence was exchangeable always, at the will of the government, for a remission of the participant's own penalties, upon a condition of disclosure, that would bring those to whom he had plighted his faith and loyalty within the grasp of the prosecutor? I cannot think so."

Mr. Justice Field and Judge Grosscup were on strong historical ground. The Fifth Amendment was designed to protect the accused against infamy as well as against prosecution. A recent analysis by Professor Mitchell Franklin of Tulane illuminates the point. See The *Encyclopédiste* Origin and Meaning of the Fifth Amendment, 15 Lawyers Guild Rev. 41. He shows how the Italian jurist, Beccaria, and his French and English followers, influenced American thought in the critical years following our Revolution. The history of infamy as a punishment was notorious. Luther had inveighed against excommunication. The Massachusetts Body of Liberties of 1641 had provided in Article 60: "No church censure shall degrad or depose any man from any Civill

dignitie, office, or Authoritie he shall have in the Commonwealth." Loss of office, loss of dignity, loss of face were feudal forms of punishment. Infamy was historically considered to be punishment as effective as fine and imprisonment.[4]

The Beccarian attitude toward infamy was a part of the background of the Fifth Amendment. The concept of infamy was explicitly written into it. We need not guess as to that. For the first Clause of the Fifth Amendment contains the concept *in haec verba:* "No person shall be held to answer for a capital, or otherwise *infamous* crime,[5] unless on a presentment or indictment

---

[4] Infamy as a sanction in Roman Law is traced in Tatarczuk, Infamy of Law, Canon Law Studies No. 357, The Catholic University of America (1954), 1–13. The penalties that Roman Law attached to infamy are familiar: exclusion from the army, from all public service, and from the exercise of certain public rights. *Id.,* at 10.

[5] The cases arising under the first Clause of the Fifth Amendment recognize that what may be considered an "infamous crime" within the meaning of that Clause may be affected by changes of public opinion from one age to another. See *Ex parte Wilson,* 114 U. S. 417, 427; *Mackin* v. *United States,* 117 U. S. 348, 351; *United States* v. *Moreland,* 258 U. S. 433, 441, 451 (dissenting opinion by Brandeis, J.). In *United States* v. *Waddell,* 112 U. S. 76, the Court refused to decide the "very important" question whether a crime was made "infamous" when upon conviction the defendant became "ineligible to any office, or place of honor, profit or trust created by the Constitution or laws of the United States." Justice Miller said: "When we bring this language, which is not the sentence of the court, but an indelible disgrace affixed to the party convicted, by the declaration of the law itself, into direct connection with the language of the fifth article of amendment of the Constitution . . . there does arise a very serious question whether *this* crime is not made an infamous one by the language of the statute, and cannot, therefore, be prosecuted by information." *Id.,* at 82. The Court did not decide the question because it had not been argued nor presented to the lower courts. And see *Ex parte Wilson, supra,* at 426.

The Fifth and Sixth Amendments place the grand and petit juries as barriers between the government and the individual. The provi-

of a Grand Jury . . . ." (Italics added.) And the third Clause, the one we are concerned with here—"No person . . . shall be compelled in any criminal case to be a witness against himself . . ."—also reflects the revulsion of society at infamy imposed by the State. Beccaria, whose works were well known here [6] and who was particularly well known to Jefferson,[7] was the main voice against the use of infamy as punishment. The curse of infamy, he showed, results from public opinion. Oppression occurs when infamy is imposed on the citizen by the State. The French jurist, Brissot de Warville, wrote in support of Beccaria's position, "It is in the power of the mores rather than in the hands of the legislator that this terrible weapon of infamy rests, this type of civil excommunication, which deprives the victim of all consideration, which severs all the ties which bind him to his fellow citizens, which isolates him in the midst of

sions for those two juries help emphasize the function played by the Bill of Attainder clauses of the Constitution. See Art. I, § 9, cl. 3; Art. I, § 10, cl. 1. The guarantee of jury trial and the prohibition of Bills of Attainder place beyond the pale the imposition of infamy or outlawry by either the Executive or the Congress. The penalties proscribed as Bills of Attainder extend to disqualification for government employment and outlawry from the professions. See *United States* v. *Lovett,* 328 U. S. 303; *Ex parte Garland,* 4 Wall. 333; *Cummings* v. *Missouri,* 4 Wall. 277.

[6] Beccaria seems to have been principally introduced to America by Voltaire. See Barr, Voltaire in America (1941), 23–24. Barr states, "Beccaria's *Essay on Crimes and Punishment* with its famous commentary by Voltaire was known in America immediately after its first appearance in France and was the first of Voltaire's works to be published in America. It was popular in lending libraries and as a quickly sold item in bookstores, because of general interest in the formation of a new social order. A separate monograph would be necessary to trace the influence of this epoch-making tract." *Id.,* at 119.

[7] See Chinard, The Commonplace Book of Thomas Jefferson (1926), 298 *et seq.*

society. The purer and more untouched the customs are, the greater the force of infamy." I Theorie des Loix Criminelles (1781) 188. As de Pastoret said, "Infamy, being a result of opinion, exists independently of the legislator; but he can employ it adroitly to make of it a salutary punishment." [8] Des Loix Pénales (1790), Pt. 2, 121.

It was in this tradition that Lord Chief Justice Treby ruled in 1696 that ". . . no man is bound to answer any questions that will subject him to a penalty, or to infamy." *Trial of Freind,* 13 How. St. Tr. 1, 17.

There is great infamy involved in the present case, apart from the loss of rights of citizenship under federal law which I have already mentioned. The disclosure that a person is a Communist practically excommunicates him from society. School boards will not hire him. See *Adler* v. *Board of Education,* 342 U. S. 485. A lawyer risks exclusion from the bar (*In re Anastaplo,* 3 Ill. 2d 471, 121 N. E. 2d 826); a doctor, the revocation of his license to practice (cf. *Barsky* v. *Board of Regents,* 347 U. S. 442). If an actor, he is on a black list. (See Horowitz, Loyalty Tests for Employment in the Motion Picture Industry, 6 Stan. L. Rev. 438.) And he will be able to find no employment in our society except at the

---

[8] de Pastoret, *supra,* 125–126, wrote:

"Penalties which, in France, produce infamy in law are (in addition to corporal or afflictive penalties), *la claie,*\* the iron collar or the pillory, civil death, censure, condemnation of memory, condemnation to be led around on an ass wearing a straw hat, degredation from the order of nobility, fine in a criminal matter when a judgment confirms it . . . public confession and apology, forced alms in civil matters, permanent prohibition to hold office."

\**Traîner sur la claie* was the means used to drag the condemned to execution. The same thing was done to the bodies of suicides. For a description of this, see Saint-Edme, *Dictionnaire De La Pénalité Dans Toutes Les Parties Du Monde Connu* (1825), Vol. 3, 242–244.

lowest level, if at all.   These facts make most persuasive the words of Judge Grosscup in *United States* v. *James, supra,* at 264–265, written in 1894:

> "The battle for personal liberty seems to have been attained, but, in the absence of the din and clash, we cannot comprehend the meaning of all the safeguards employed.   When we see the shield held before the briber, the liquor seller, the usury taker, the duelist, and the other violators of accepted law, we are moved to break or cast it aside, unmindful of the splendid purpose that first threw it forward. But, whatever its disadvantages now, it is a fixed privilege, until taken down by the same power that extended it.   It is not certain, either, that it may not yet serve some useful purpose.   The oppression of crowns and principalities is unquestionably over, but the more frightful oppression of selfish, ruthless, and merciless majorities may yet constitute one of the chapters of future history.   In my opinion, the privilege of silence, against a criminal accusation, guarantied by the fifth amendment, was meant to extend to all the consequences of disclosure."

It is no answer to say that a witness who exercises his Fifth Amendment right of silence and stands mute may bring himself into disrepute.   If so, that is the price he pays for exercising the right of silence granted by the Fifth Amendment.   The critical point is that the Constitution places the right of silence *beyond the reach of government*.   The Fifth Amendment stands between the citizen and his government.   When public opinion casts a person into the outer darkness, as happens today when a person is exposed as a Communist, the government brings infamy on the head of the witness when it compels disclosure.   That is precisely what the Fifth Amendment prohibits.

Finally, it is said that we should not disturb *Brown* v. *Walker* because it is an old and established decision. But this Court has always been willing to re-examine and overrule constitutional precedents, even those old and established. In *Erie R. Co.* v. *Tompkins,* 304 U. S. 64, this Court overruled *Swift* v. *Tyson,* 16 Pet. 1, which had been a rule of decision for 95 years. *United States* v. *South-Eastern Underwriters Assn.,* 322 U. S. 533, partly overruled *Paul* v. *Virginia,* 8 Wall. 168, which had been decided 75 years previously. In *Kilbourn* v. *Thompson,* 103 U. S. 168, the Court rejected some of the grounds of decision in *Anderson* v. *Dunn,* 6 Wheat. 204, which had been standing for 59 years. *Brown* v. *Walker,* decided by a bare majority of the Court and now 60 years old, has no greater claim to sanctity than the other venerable decisions which history showed had outlived their usefulness or were conceived in error. And a rejection of *Brown* v. *Walker* would certainly be far less disruptive of a system of law than was the overruling of *Swift* v. *Tyson,* which affected the trial of every diversity case in the federal courts.