**GRAND JURY PROCEEDINGS and concerning Myron Teegardin (Misc. GJ77–1W) and Robert J. Tope (Misc. GJ77–2W).**

**Misc. Nos. GJ77–1W, GJ77–2W.**

United States District Court,
D. South Dakota.

Jan. 12, 1978.

David V. Vrooman, U. S. Atty., Sioux Falls, S. D., for plaintiff.

Myron Teegardin pro se.

Robert J. Tope pro se.

## MEMORANDUM OPINION

BOGUE, District Judge.

The files in these cases reflect that on June 23, 1977, Acting Assistant United States Attorney General Myron C. Baum, upon request by the United States Attorney for South Dakota, had specifically authorized said United States Attorney to apply for an order compelling testimony and the production of information from Myron E. Teegardin and Robert J. Tope before a grand jury. Additionally, Assistant Attorney General Baum stated that the Criminal Division had no objection to proposed grants of immunity for Mr. Teegardin and Mr. Tope.

On July 6, 1977, the United States Attorney filed motions pertaining to Mr. Tope and Mr. Teegardin and therein stated in each case substantially as follows: (1) that the individual in question was likely to refuse to testify or provide other information on the basis of the fifth amendment privilege against self-incrimination; (2) that the testimony and information sought were or could be necessary to the public interest; and (3) that the Acting Assistant Attorney General in charge of the Tax Division, Department of Justice, had approved the course of action being taken. Orders compelling testimony and production of information were sought.

The District Court, the Honorable Fred J. Nichol presiding, granted the government's motions on July 6, 1977, and pursuant to 18 U.S.C. § 6002(1), ordered Tope and Teegar-

din (the witnesses) to give testimony or provide information to the grand jury as to all matters about which each might be interrogated. The orders were worded so that they would take effect only if both witnesses refused to answer.

On July 29, 1977, both witnesses filed motions "To Suppress The Grand Jury's Request For Other Documents." Apparently, the grand jury had requested that records relating to Tope's and Teegardin's incomes from 1975 and 1976 be brought to the grand jury by August 6, 1977.[1] Both men raised several objections to the requests, which objections will be discussed fully at a later moment.

On September 7, 1977, both witnesses filed motions to quash grand jury subpoenas. It seems that both men had appeared before the grand jury in August to testify, but that they had failed to turn over the records sought. Subpoenas duces tecum had been issued August 8, 1977, commanding, in substance,[2] that records of personal and business financial transactions be brought to the grand jury on September 7, 1977. The motions to quash were not heard by any court and the records were not produced.

On November 2, 1977, the government moved this Court for an order to be directed to Tope and Teegardin, respectively, to compel them to show cause why they should not be held in contempt for failure to honor a grand jury subpoena.

This Court ordered the matter to be brought on for a hearing on November 14, 1977 in Rapid City, South Dakota. Tope and Teegardin appeared on November 14, 1977, and again filed motions to quash. This Court, realizing for the first time that their prior motions had not been heard, advised both of them that they should make whatever record they pleased on the motions to quash and further advised them and the government attorneys that a show

cause hearing was premature. Both witnesses stated that they would rest upon their motions and their statements on the record at that time, and the Court took the matter under advisement. The Court has now had an opportunity to consider the many issues raised, and for the reasons hereinafter stated the Court believes that the motions to quash must be denied.

I.

As is evident from our recitation of the procedural history in this case, some confusion existed prior to its ultimately reaching this Court's attention. Because the grand jury was sitting in different parts of South Dakota, the files were shuffled from place to place during the early stages of the proceedings, and nothing had been definitively resolved as to the objections to the subpoenas at the time the show cause hearing was set. Our first task, therefore, will be to examine the motions to quash the subpoenas duces tecum and the two motions each styled as a "Motion to Suppress the Grand Jury's Request For Other Documents" and to enumerate the reasons which have been advanced in opposition to the subpoenas.

Tope and Teegardin have each advanced the following objections to the requests of the grand jury, which requests are now in the form of the subpoenas duces tecum:

1. The subpoenas duces tecum allegedly violate the witnesses' fourth amendment rights in that they are an unreasonable search and seizure and because they violate the privacy insured by the fourth amendment.

2. The subpoenas allegedly violate the witnesses' fifth amendment privilege against self-incrimination despite the government's offer of immunity which the witnesses characterize as a travesty of justice.

1. Tope and Teegardin, in their nearly identical motions, made reference to a "subpoena" apparently issued prior to July 29, 1977. We have no copy in the record. In any event, the issues now being contested are raised with reference to the subpoenas duces tecum issued in August.

2. Each subpoena duces tecum is included in full in the appendices.

3. The subpoenas allegedly violate the common law privilege that precludes the government from being able to compel one spouse to testify against the other.

4. The subpoenas allegedly violate other constitutional rights of the witnesses and their spouses secured to them by the first, sixth, ninth and tenth amendments.

5. The subpoenas allegedly violate certain statutes (e. g. the 1976 Tax Reform Act) as well as certain legal principles (e. g. *res judicata* and the mootness doctrine).

We have reorganized the challenges raised by the witnesses for ease of discussion. We make no pretense of being exhaustive as several of the matters raised are so plainly frivolous that no comment is required.

## II.

One of the more significant challenges raised by these subpoenas is the challenge that they violate the fourth amendment rights of the witnesses. The separately stated objection that the subpoenas intrude upon the witnesses' right to privacy is ultimately an objection that hinges upon the validity of the fourth amendment challenge; hence, in our enumeration of the issues, the complaint about invasion of privacy was incorporated into the allegation of an allegedly illegal search and seizure.

The subpoena duces tecum addressed to Mr. Tope commands that many items be brought to the grand jury, among which items are: (1) banking records, (2) contracts, (3) the business records from Tope's Elevator, and (4) records pertaining to any farm income and expenses. The subpoena duces tecum addressed to Mr. Teegardin commands that the following items, among others, be brought to the grand jury: (1) employee forms W–2 Wage and Tax Statements, (2) banking records including loan applications and repayment schedules, and (3) contracts. In both subpoenas the information sought is limited to the years 1975 and 1976.

The law now is that the fourth amendment prohibition against unreasonable searches and seizures protects people, not things or places. *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The fourth amendment erects a protective wall around those aspects of an individual's life concerning which he or she has a reasonable expectation of privacy. We are not certain that every item listed in the subpoenas duces tecum in these cases is within the protective wall that exists, figuratively speaking, by virtue of the fourth amendment. We are, however, convinced that many of the items sought are fourth amendment material because an individual would have a reasonable expectation that they would not be exposed to public view. Trying to carve up the contents of the subpoenas to determine whether or not some of the things sought would fall outside of the fourth amendment protections would be an exercise in futility.

■ Having established that the fourth amendment applies, it then becomes necessary to decide how, if at all, the government can get into the area which is thereby protected. While the reasonable expectation of privacy determines the perimeters of the fourth amendment, the nature of the intrusion contemplated by the government determines the showing which the government must make before entry can be had into a protected area. The intrusion contemplated, of course, is that the items listed would be exposed to the grand jury during the course of an investigation.

■ In order to have the subpoenas enforced in these cases; i. e., in order to demonstrate that the government can lawfully penetrate a constitutionally protected area, the government must make an initial showing on the following four points: (1) the government must show that the grand jury's investigation is authorized by law; (2) the government must show that the investigation itself is proceeding according to a legitimate purpose; i. e., that the grand jury is investigating possible criminal activity which, if it exists, is within the power of the federal government to prosecute under the federal criminal code; (3) the government must show that the items

sought by the subpoenas are relevant to the investigation; and (4) the government must finally show that the intrusion into the fourth amendment area is reasonable under the circumstances. To this end, the objects demanded must be described with particularity, must cover a reasonable period of time and compliance must be possible without an unreasonable expenditure of time and money.

The first three items heretofore listed are properly required, we believe, by virtue of the court's inherent supervisory powers over the grand jury. *In re Grand Jury Proceedings,* 507 F.2d 963 (3rd Cir. 1975). The fourth point is required by long-established case law concerning the limits on subpoenas duces tecum issued by grand juries. *Hale v. Henkel,* 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652 (1906), *Oklahoma Press Publishing Co. v. Walling,* 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614 (1946). Due to the Eighth Circuit's emphasis on the "regularity" of grand jury proceedings and hence, the regularity and propriety of a grand jury subpoena in *Universal Manufacturing Company v. United States,* 508 F.2d 684 (8th Cir. 1975), this Court may be requiring more of the government than the law in this circuit demands. We believe, however, that under all of the circumstances in these cases, the points outlined, *supra,* are a reasonable burden to place upon the government when materials within the purview of the fourth amendment are sought.

■ In view of some obvious misunderstandings of the law which became evident at the hearing on this matter, a few more words of clarification may be in order. First, the idea that subpoenas duces tecum cannot be issued by a grand jury without probable cause is absurd. The purpose of a grand jury is to determine whether there is probable cause to believe that a crime has been committed and whether there is probable cause to believe that someone in particular committed it. The grand jury is in a sense an investigatory body of ordinary citizens; its members sift through the evidence presented to it and make a determination as to whether or not probable cause exists

with reference to the commission of a federally defined crime. Necessarily, the grand jury's function *precedes,* logically and in the time sequence of events, any finding of probable cause. Therefore, the showing required in order to compel people to present things to a grand jury is, and must be, quantitatively less than a showing of probable cause. The simple truth is that not all penetrations of the area protected by the fourth amendment require a probable cause showing as is required before a warrant can be issued. A grand jury can get into an area protected by the fourth amendment if the attorney for the government can make the less rigorous showing heretofore discussed.

■ In this case, the government has done all that is required. A special agent took the stand at the hearing on November 14, 1977. We are satisfied that a grand jury investigation into possible violations of the Internal Revenue Code is underway. Nobody can dispute that this is a legitimate function of a federal grand jury duly called and properly constituted. This Court has examined the subpoenas duces tecum and is satisfied that everything sought has some relevancy to the revenues and expenses of the named persons for the years 1975 and 1976. Assuredly, the relevancy of some of the items is more immediately apparent than the relevancy of other items, but nothing in the subpoenas is extraneous to what would logically be considered by someone interested in getting a complete picture of these witnesses' finances in 1975 and 1976. And it is no secret that the grand jury wants precisely that—the complete picture.

The only thing left is to make a judgment as to whether or not the demands of the subpoenas are unreasonable. The interest of the public in complete and thorough investigation must be balanced against the obvious inconvenience to the witnesses. This Court's conclusion is that the subpoenas, although inconvenient and undoubtedly a nuisance, are not oppressive or unreasonable. The records sought are limited to two recent years. We do not believe (and the witnesses have made no effort to demon-

strate) that the cost of compliance in terms of time and money will be unreasonably burdensome. We hold that the demands of the subpoenas duces tecum are reasonable, and that the fourth amendment challenge advanced by the witnesses must fail.

### III.

In addition to raising their fourth amendment challenge, the witnesses have complained about their fifth amendment rights being violated, have raised the troublesome problem of collateral consequences (consequences other than criminal penalties), and have alleged that the immunity being offered is a "travesty of justice." Both witnesses asked the Court at the hearing on their motions to quash whether the breadth of their fifth amendment privilege against self-incrimination could be more precisely explained and whether the proposed grant of immunity would affect their possible exposure to civil liability under the tax code. In this section the Court hopes to answer the questions raised with a short statement of the applicable principles of law.

■ The first principle that must be comprehended is that the fifth amendment privilege against self-incrimination extends only to "testimony" or "communications." *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); *United States v. Dionisio,* 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973). If neither testimony nor communications are being sought, the privilege against self-incrimination is inapplicable. For example, a person can be compelled to exhibit physical characteristics, and no fifth amendment challenge will succeed. *See Gilbert v. California,* 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), where handwriting exemplars were held to be outside of the fifth amendment privilege, and *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), where the Supreme Court held that a person's voice used as an "identifying physical characteristic" is not something that can be withheld by virtue of the fifth amendment privilege against self-incrimination.

A second principle of great importance is that the privilege against self-incrimination is limited to preventing "incrimination," i. e. the production of evidence that would tend to establish *criminal conduct. Ullmann v. United States,* 350 U.S. 422, 76 S.Ct. 497, 100 L.Ed. 511 (1956). The fact that other undesirable consequences (other than incrimination) could result from yielding the information sought is often of much concern to an individual called upon to provide information, but that concern does not raise a fifth amendment issue.

In the cases under consideration we can safely assume that at least some of the material sought by the grand jury is protected by the fifth amendment; otherwise, the offers of immunity would make no sense. At this juncture, therefore, we need not inquire whether the fifth amendment is applicable (we can assume it is); rather, we must concern ourselves solely with the effect a grant of immunity would have for the two witnesses.

■ Immunity granted pursuant to 18 U.S.C. § 6002, *et seq.* prevents the government from using any information compelled, or any information obtained indirectly from the information given under compulsion, against the witness in any criminal case except in a prosecution for perjury, giving a false statement or failing to comply with the court order wherein immunity was granted. The government no longer gives transactional immunity, i. e. immunity from any possible prosecution for acts involving the transaction concerning which the witness is called upon to testify. The constitutionality of this "use plus derivative use" immunity was upheld by the United States Supreme Court in *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). Therefore, the law now is that if the government properly applies for an order granting immunity, and the Court grants immunity by order, then a witness can be compelled to testify and present information to a grand jury with the assurance that nothing derived from that testimony or information can be used against him in a criminal proceeding but

without any assurance that the government will never attempt to prosecute him for something connected with the matter about which he testifies.

The witnesses have specifically inquired as to the effect, if any, of a grant of immunity on possible civil liabilities. The law is that a grant of immunity precludes the application of "penalties affixed to criminal acts." *Ullmann v. United States, supra,* quoting *Boyd v. United States,* 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886). Risk of civil liability, not of a penal character, is not removed by a grant of immunity. *Kastigan v. United States, supra.*

The rationale is that immunity is co-extensive with the protection offered by the fifth amendment. As discussed, *supra,* the fifth amendment privilege against self-incrimination guarantees a witness nothing more than the freedom to decline to do or say things which could expose him to *criminal liability;* therefore, a grant of immunity is adequate to supplant the privilege as long as it guarantees that neither the information obtained nor its fruits will be used in a criminal proceeding.

■ In the present cases a grant of immunity will guarantee the witnesses that neither the information supplied pursuant to the subpoenas nor information derived therefrom will be used in a criminal proceeding against the witnesses. (Exceptions such as perjury were noted earlier.) A grant of immunity will *not* guarantee that the information given would never be used to ascertain or prove civil liability under the U.S. Tax Code. This Court is not suggesting that the U.S. government necessarily would use information gained by these subpoenas duces tecum to establish civil liability, and we are satisfied that the grand jury is not being used for improper purposes. But the witnesses must understand that a grant of immunity itself does not prevent anything more than criminal prosecution based directly or indirectly upon evidence given under compulsion.

Some awareness of the limits of the fifth amendment, and an awareness of the concomitant reality that immunity is not per se a complete bath that washes away all of the past, has no doubt led the witnesses to characterize immunity as a "travesty of justice." They have distinguished company. *See* the dissenting opinions of Mr. Justice Douglas and Mr. Justice Black in *Ullmann v. United States, supra,* and the dissenting opinions of Mr. Justice Douglas and Mr. Justice Marshall in *Kastigar v. United States, supra.* The fact is, however, that this Court cannot apply as law the arguments set out in dissenting opinions of Supreme Court Justices any more than we can elevate the witnesses' personal views to the status of law. The Constitution is interpreted by the highest judicial authority in the United States—the Supreme Court— and what the majority has held is now the law. People can have any opinions they please about what the Constitution *should* mean, but what it *does* in fact mean is not determined by popular opinion but by the votes of the justices who sit on the Supreme Court; hence, Mr. Tope and Mr. Teegardin are entitled to their opinions about the law but they will be obliged to follow it even if they do not like it. And if immunity is granted by order of a federal court, then the law is that the fifth amendment privilege is supplanted and failure to comply with the order can mean incarceration.

■ All that remains to be stated is the procedure which the law requires for proper grants of immunity. In these cases Judge Nichol signed an order requiring testimony, etc., back in July, 1977. The record presented to this Court does not indicate whether a notice and hearing preceded that order; but, even if the order was *ex parte,* it is no doubt true that the requirements of due process were met. There is authority for the proposition that an order granting immunity and ordering compliance with a subpoena can be lawfully signed without a notice or hearing. *United States v. Leyva,* 513 F.2d 774 (5th Cir. 1975).

Notwithstanding the fact that the witnesses were and remain under an order from Judge Nichol, it seems proper at this time to require the government to submit an application for immunity to this Court.

We do this for several reasons. First, a great deal of time has elapsed between the order granting immunity and the denial of the motions to quash; consequently, we are not certain that the import of an order granting immunity and compelling the production of information is clear to the witnesses. The direction of the court to testify and provide evidence should be given in the clearest possible manner. *United States v. DiMauro,* 441 F.2d 428 (8th Cir. 1971). Second, although the duty of a court in granting immunity has been characterized as "ministerial" (*United States v. Leyva, supra*), we think it is desirable that the grant of immunity in circumstances such as this be done in court so that the witnesses can raise questions, if they have any, about the meaning of the legal process in which they are involved. An immunity hearing, therefore, will be scheduled as soon as practicable.

■ At this hearing the government attorney will be obliged to show the following: (1) that either the Attorney General, or the Deputy Attorney General or a designated Assistant Attorney General has approved the request being made; (2) that the information to be compelled may be necessary to the public interest; and (3) that the witnesses have refused to testify on the basis of their privilege against self-incrimination. 18 U.S.C. § 6003. If those formalities are met, the Court will have no choice other than to grant immunity and compel testimony under the dictates of 18 U.S.C. § 6003 which requires that the "district court . . . shall issue" said order when the three-point showing, *supra*, is made.

### IV.

■ The motions also raise the issue of the so-called husband-wife privilege. The husband-wife privilege is a common law rule of evidence, recognized by Federal Rule of Evidence 501, which generally allows a person to preclude the introduction of testimony from a person's spouse if the testimony would reveal confidential communications between the spouses. A branch of this doctrine of privilege is the rule (which has many exceptions) that a person cannot be required to testify adversely against his or her spouse. The law in this area has developed on a case-by-case basis in the federal system. It is true, as a general proposition, that the husband-wife privilege applies to grand jury proceedings. *In re Snoonian,* 502 F.2d 110 (1st Cir. 1974).

In the *Snoonian* case a man who had been subpoenaed to testify before a federal grand jury refused to answer questions asked by a government attorney on the theory that the husband-wife privilege would be violated. The husband apparently feared that information given could possibly be used against his wife in a future tax fraud case. The district judge ordered the witness to testify for two reasons. First, the threat to the wife, if any, was speculative. Second and more important, the Assistant United States Attorney in charge of the investigation filed an affidavit wherein he unequivocally stated that no testimony of the witness or its fruits would be used in any manner in any proceeding against the witness's wife. That affidavit bound the government to a course of action which negated the rationale underlying the privilege.

■ In these cases, at the request of the Court, the United States Attorney for the District of South Dakota filed two affidavits (one for each case) and therein stated that no testimony of the witnesses nor fruits of that testimony would in any way be used against the present wives of the witnesses.[3] This Court believes that these affidavits are sufficient to assure the witnesses that the husband-wife privilege is in no danger. If the government would ever attempt to use any materials presented to the grand jury pursuant to an order of this Court in a proceeding (criminal or civil) against either of the spouses of these witnesses, there would be no hesitation on the part of the Court to prevent that abuse by an appropriate order. We are confident no such thing will happen.

---

**3.** We construe the affidavits to cover materials (records, etc.) as well as testimony.

There is no allegation, and we cannot seriously entertain the idea, that any of the material sought by the subpoenas duces tecum constitutes a "confidential communication" between husband and wife. Therefore, that branch of the law is inapplicable. The husband-wife privilege does not require that the subpoenas be quashed.

## V.

Both of these grand jury witnesses claim that the subpoenas duces tecum violate the first amendment; they are no more specific than that. It is difficult to see any connection whatever between these subpoenas and the freedom of the press, the right to free exercise of religion, the establishment clause, the freedom of speech or the right to assemble and to petition the government for a redress of grievances. In a previous case [4] in this Court involving administrative summonses, an argument was made to the effect that the federal income tax violated the conscience; hence, freedom of religion was involved. We rejected that argument then, and if that is implicit in the issue now raised, it is summarily rejected. There is nothing else in either of these files that raises any legal issue having anything to do with the first amendment to the United States Constitution or any corresponding provisions of the State Constitution.

The witnesses also contend that the subpoenas present a sixth amendment problem. The right to a speedy and public trial, and the right to an impartial jury obviously are not being infringed because no trial is being held, no indictment has been returned, and in fact the witnesses have been granted immunity. Obviously, compulsory process for securing witnesses and the right to confront accusers are not problems faced by the witnesses. Thus, the only thing even arguably at issue under the sixth amendment is the right to counsel. The law is clear that witnesses appearing before a federal grand jury have no right to a counsel in the grand jury room. *See e. g. United States v. Daniels,* 461 F.2d 1076 (5th Cir. 1972). The sixth amendment challenge has no merit.

It is, moreover, ironic that these witnesses who elected to proceed *pro se* and who are representatives of a mentality that adamantly rejects any association with counsel trained in the law have come full circle and end up arguing that a sixth amendment issue is raised because of these grand jury subpoenas. Either they *are* seriously arguing for the right to have counsel or they are simply making copies of briefs relating to various constitutional rights without even attempting to relate the legal arguments to the facts at hand. In either case, they do their cause no service by advancing spurious arguments.

As to the general allegation that the ninth amendment is being infringed upon by the subpoenas, we can only reply with general statements of the law. The ninth amendment affirms the existence of rights not specifically enumerated in amendments I–VIII. This amendment was used by Justice Douglas to expound the doctrine of penumbral rights—the doctrine that certain rights not specifically enumerated are so central to the meaning of enumerated rights and the values embodied therein that they exist in the shadow of the enumerated rights. *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). No doubt the ninth amendment is a potential conduit through which grievances can be pressed when a citizen has a grievance which is not specifically covered somewhere else in the Constitution. The problem here is that any analysis would be an exercise of the imagination because we do not have any allegation that any specific value or right other than these enumerated is being trampled upon. In short, the Court has been given only a generality and can only return the same; nothing has been provided to require any extended analysis under the ninth amendment.

The situation is similar with the allegation that the tenth amendment is being violated. The tenth amendment is an affir-

4. *U. S. v. Raabe,* 431 F.Supp. 424 (D.S.D.1977).

mation of the fact that the federal government is a limited government; powers not granted it by the Constitution are reserved to the states or to the people. What the federal officials are allegedly doing that is not within their powers is not specifically set forth in the motions under consideration.

■ The nub of the witnesses' protest is undoubtedly a dislike for the sixteenth amendment which gives Congress the "power to lay and collect taxes on incomes, from whatever source derived, without apportionment among the several States . . ." The power to collect necessarily includes the power to authorize someone to do the collecting and empowers federal officials using proper procedures to make investigations to insure that collections are being properly made. This whole scheme of things significantly altered the federalism of an earlier era, but the alteration was made by the people within the framework of the United States Constitution. The allegation that a subpoena issued in the course of a grand jury investigation into possible violations of the tax code violates the tenth amendment is totally without merit.

The witnesses have also alleged that rights under the State Constitution corresponding to the rights under the Federal Constitution discussed, *supra,* are in issue. As to alleged violations of state constitutional rights corresponding to the ninth and tenth amendments, the claim is obviously nonsense. As to rights under the State Constitution which do in fact correspond to those rights discussed, *supra,* which are guaranteed by the United States Constitution, the short answer is that the federal government is not bound by state constitutions. The states cannot erect barriers to prevent federal officers from carrying out functions which are lawful under the United States Constitution. And finally, there is no reason to suspect that any rights guaranteed by South Dakota are being trampled upon; the witnesses have only presented sweeping generalities and point to no specific abuses of the grand jury's investigative powers.

■ The witnesses have no standing to raise the constitutional rights of their wives.

All objections to the subpoenas duces tecum which are based upon constitutional arguments must be rejected.

## VI.

■ Another challenge is that the subject matter is moot. "Mootness" is a concept that aids in deciding whether or not there is a live case or controversy which may be properly heard by a federal court. The concept has nothing whatever to do with defining the powers of a federal grand jury. Likewise, the idea of *res judicata* has nothing to do with the investigatory powers of grand juries. *Res judicata* means that something has been adjudged; i. e., judgment has been entered in a court and therefore the matter cannot be raised in a subsequent judicial proceeding. Returning a true bill or a no bill is not a "judgment" by any stretch of the imagination.

The witnesses contend that the subpoenas are an unlawful attempt to override the provisions of the 1976 Tax Reform Act which sets limits on the disclosure that can be made of information concerning tax returns. They also allege that the previous grand jury, the United States Attorney and the Honorable Fred Nichol, District Judge, appear to have made unauthorized disclosure of information.

As with some of the other claims made, there is simply no way to evaluate their broad attacks. The witnesses make no statements as to what was allegedly revealed, to whom, or under what conditions. We have, we think, expounded upon enough principles of law in this opinion to meet the more serious issues raised. We refuse to venture into a survey of the provisions of the 1976 Tax Reform Act without having any allegations made with specificity.

## VII.

In addition to the many items heretofore discussed, the Court is inclined to devote a

few sentences to a motion filed by each witness entitled "Motion for Notification of Rights Sua Sponte." Motions captioned in this manner have become routine in cases involving grand jury proceedings, administrative summonses and other matters relating to the tax code.

These motions make no sense. The very term *"sua sponte"* means "of his or her own will or motion; voluntarily, without prompting or suggestion." Black's Law Dictionary (4th Ed. 1968). Thus, if this Court does an act *sua sponte,* it is done of the Judge's volition (on the Court's own motion) not in response to a request or upon the motion of a party.

If the witnesses filed these motions in the hope that the Court would spontaneously give them advice of their rights at some future time in the event contempt proceedings are initiated, they are superfluous. The Court will, by virtue of the requirements of constitutional law, advise the defendants in open court of their rights if a civil contempt hearing is ever necessary, and obviously would do the same if a criminal contempt proceeding were initiated. But the rights which exist and which the Court is obliged to explain depend upon the nature of the proceedings, if any, and we will hazard no guess in this opinion as to what course of events will unfold.