Clarence A. PHELAN, Plaintiff,

v.

Erastus CORNING, II, Individually and as Mayor of the City of Albany, Harry F. Maikels, Individually and as Commissioner of Public Works of the City of Albany and The City of Albany, Defendants.

No. 79–CV–588.

United States District Court, N.D. New York.

June 30, 1983.

Rowley, Forrest & O'Donnell, Albany, N.Y., for plaintiff; Brian J. O'Donnell, Albany, N.Y., of counsel.

Vincent J. McArdle Jr., Corp. Counsel, Albany, N.Y., for defendants; Paul M. Collins, Albany, N.Y., of counsel.

MEMORANDUM–DECISION and ORDER

MINER, District Judge.

### I

Plaintiff brought this civil rights action pursuant to the provisions of 42 U.S.C. §§ 1983 and 1985, claiming that he was discharged from the position of Deputy Commissioner of the Department of Public Works of the City of Albany in violation of rights guaranteed to him by the first, ninth and fourteenth amendments to the United States Constitution. At trial, plaintiff asserted only the first amendment violation as a basis for the relief sought—compensatory damages for lost pay and mental anguish in the sum of $250,000; punitive damages in the sum of $1 million dollars (as against the individual defendants only); and attorney's fees to be fixed by the Court. Jurisdiction is predicated upon 28 U.S.C. § 1343. The action was tried to the Court on March 29, 1983,[1] and final submissions were filed on April 12, 1983. There follow the findings of fact (including as part hereof the "Stipulated Facts" submitted by the parties) and the conclusions of law mandated by Fed.R.Civ.P. 52(a). [See Appendix.]

### II

Clarence A. Phelan, the plaintiff, served in various capacities in the City of Albany Public Works Department from July 15, 1968, when he began his employment as a chauffeur, until January 27, 1978, when he was discharged as Deputy Commissioner of Public Works. Plaintiff was appointed to the position of Deputy Commissioner by defendant Harry F. Maikels, Commissioner of Public Works, on January 10, 1974, approximately ten days after Maikels became Commissioner. The appointment was approved by the Mayor of the City of Albany, defendant Erastus Corning II.[2]

By letter dated October 21, 1974, the Executive Director of Council 66, American Federation of State, County and Municipal Employees, notified the Mayor of Albany that certain named city employees were engaged in organizing an employees' union. Among those named in the letter were George Strokes and Willard Van Valkenburg, equipment operators in the Department of Public Works. Prior to that time, Strokes had been observed soliciting employees at the Bureau of Streets garage. On or about November 12, 1974, Strokes was discharged from his employment and, soon thereafter, challenged his discharge in an improper practice proceeding before the New York State Public Employment Relations Board and in a proceeding pursuant to N.Y.Civ.Prac.Law Art. 78 before the New York Supreme Court. Both proceedings

---

1. The only witnesses who testified at trial were defendant Maikels, plaintiff, and Michael C. Manning, former Deputy Field Commissioner of the Department of Public Works. The parties submitted extensive pre-trial stipulations, and various exhibits were received in evidence.

2. The Court notes that Mayor Corning died after the trial of this lawsuit. A motion may be made at the foot of the judgment to substitute his estate representative as a party defendant. Fed.R.Civ.P. 25(a).

were settled by a stipulation permitting Strokes to return to work with back pay and pension and seniority rights.

Willard Van Valkenburg was absent from his employment from January 20–January 31, 1975. During his absence, Strokes was ordered, but refused, to operate the backhoe equipment assigned to Van Valkenburg. Department policy called for the submission of a doctor's certificate after the third day of absence. Plaintiff notified Maikels after Van Valkenburg's third day of absence without a certificate and was told to keep a "running record" on Van Valkenburg. Accordingly, plaintiff reported to Maikels regarding the absences by letters dated January 23, 24, 27, 28, 29, 30, 31 and February 3, 1975. In the letter of January 27, plaintiff advised the commissioner as follows: "Mr. Van Valkenburg reported for duty this date, Monday, January 27th, 1975, advising that he had been sick. In-as-much [sic] as Mr. Van Valkenburg had been absent since January 20th, 1975, I sent him home until such time as he produces a Doctor's certificate that he is able to resume work." Van Valkenburg did not report for work thereafter until February 3, 1975, at which time he produced a doctor's certificate attesting to his treatment on January 27 and his ability to return to work on January 29. These facts were reported in plaintiff's letter of February 3.

Based on the information furnished to the Commissioner by plaintiff, the Corporation Counsel's office prepared charges against Van Valkenburg for a disciplinary hearing pursuant to New York Civil Service Law § 75. This was the only disciplinary hearing ever brought against a Public Works Department employee for absence due to a claim of illness. Plaintiff testified at the hearing on February 26, 1975 that he had not in fact seen Van Valkenburg on January 27, 1975 and that the charges were incorrect in that respect. It was plaintiff's belief, according to the testimony, that Van Valkenburg had spoken by telephone on January 27 with the timekeeper, Mr. Ridgway, who advised Van Valkenburg that a doctor's certificate was required. At the hearing, plaintiff testified that he did not read the charges carefully, although at trial he testified that he was directed to sign the charges without having any opportunity to read them. Apparently, no disciplinary action ever was taken against Van Valkenburg.

Plaintiff traces the diminution of his authority in the Public Works Department and his eventual discharge in January of 1978 to his testimony at the Van Valkenburg hearing. However, Michael Manning was appointed Deputy Field Commissioner on January 21, 1975 at a salary in excess of that of plaintiff. Manning had extensive experience in the private sector in excavation, paving and sewer installation. He was hired originally as a field investigator in the Public Works Department on December 9, 1974. His hiring came about as the result of the desire of the Commissioner to expand the Department's capacity to perform public works projects and to reduce the need for retaining private contractors. During his eighteen months tenure in the Department, Manning trained and personally supervised city employees in attending to broken sewer lines, drainage problems and major pavement failures, substantially improving the Department's capability for specialized work and reducing its reliance on private contractors. Although plaintiff continued to hold the title of Deputy Commissioner, his responsibilities were diminished gradually after Manning arrived. Commencing in September and October of 1974, Commissioner Maikels had become increasingly dissatisfied with plaintiff's job performance and lack of expertise, reprimanding him on several occasions for failing to coordinate the work of the street crews properly and for neglecting to give proper direction to supervisors.[3]

3. The Court accepts defendant Maikels' explanation that he expressed confidence in plaintiff's ability during the Van Valkenburg hearing because he didn't want to damage plaintiff's self respect. The sequence of actions taken by Maikels clearly reveals his true opinion of plaintiff's abilities.

At the end of October, 1975, plaintiff was placed in charge of setting up reviewing stands at Memorial Park for the Veterans Day Parade. When Commissioner Maikels found that the stands were not placed in the proper location, he ordered plaintiff to return to his desk at the Bureau of Streets garage and to remain there. Plaintiff's department automobile was taken away from him, but he continued to perform administrative duties such as ordering supplies, keeping payroll records, executing vouchers and assigning some work crews. These administrative duties gradually were taken over by George Nealon. Nealon had begun his career with the Department by working at the city golf course as a summer season laborer during his high school and college years. The golf course manager recognized him as bright and capable and recommended that he be employed at the Bureau of Streets. In the fall of 1974, Nealon came under the supervision and training of Manning, who was impressed with his abilities and recommended him for promotion to foreman about a year later. On December 31, 1976, with the consent of Mayor Corning, Nealon was promoted to the position of Acting Deputy Commissioner at a salary of $9,000 per annum, $1,000 in excess of plaintiff's annual salary. He has been an important asset to the Department, having established programs for street cleaning, sidewalk repairs, street surfacing and sewer work. He served as liaison with the Bureau of Engineering, assisted in code revisions, handled labor negotiations and worked with consulting engineers. During his employment with the Department, Nealon undertook various engineering courses and qualified for a master plumber's license. His salary was increased to $16,000 per annum on December 16, 1977.

On July 29, 1976, plaintiff was assigned to City Hall to supervise the cleaning crew there, although a cleaning crew supervisor remained on the job after plaintiff arrived. Phelan shared a basement office with the Superintendent of Buildings and had little contact with the Commissioner in this capacity. Dissatisfied with plaintiff's lack of initiative and competence and his absences from the job at City Hall, Commissioner Maikels terminated plaintiff's employment in January of 1978.

### III

Plaintiff contends that his eventual discharge from employment constituted retaliation for the testimony he gave at the Van Valkenburg hearing. This testimony, he claims, is protected by the first amendment, although plaintiff's attorney concedes that his "[r]esearch has revealed no reported case on point on the issue of whether testimony is protected by the First Amendment." (Post-Trial Memorandum on Behalf of Plaintiff, p. 9). However, plaintiff asserts that it "appears" in *Brule v. Southworth,* 611 F.2d 406 (1st Cir.1979), that the unreported district court decision subject of appeal included an opinion that certain testimony given by plaintiffs was protected by the first amendment. This Court finds no such implication in the court of appeals decision. The plaintiffs in *Brule* were correction officials who were suspended from employment by their superiors at the Rhode Island Correctional Institution after making remarks critical of a lock-up policy instituted after a prison disturbance. These remarks were made in "public statements" as well as in testimony before a state senate committee, a gubernatorial commission and the court where the inmates brought suit. Although the district court found that the plaintiffs' "public statements" were protected, and this finding was not challenged on appeal, there is no indication that the testimony given by plaintiffs was included within the ambit of constitutional protection, and the court of appeals declined to address the issue.[4]

■ In the opinion of this Court, the testimony given by plaintiff at the administrative hearing did not invoke first amend-

---

4. "Defendants do not on appeal challenge the district court's finding that plaintiffs' public statements were constitutionally protected, and we therefore do not address, nor need we decide, that question." *Brule v. Southworth, supra,* 611 F.2d at 410.

ment protections. "It is the purpose of the First Amendment to preserve an uninhibited market place of ideas in which truth will ultimately prevail .... It is the right of the public to receive suitable access to social, political, esthetic, moral, and other ideas and experiences which is crucial here." *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 390, 89 S.Ct. 1794, 1807, 23 L.Ed.2d 371 (1969). The freedom to advocate ideas is the basic guarantee of the first amendment, *Kingsley Int'l Pictures Corp. v. Regents of the University of the State of New York*, 360 U.S. 684, 688, 79 S.Ct. 1362, 1365, 3 L.Ed.2d 1512 (1959), and the free and unfettered interchange of ideas is considered essential to bring about desired changes in our society. *Roth v. United States*, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957); *see Abrams v. United States*, 250 U.S. 616, 630, 40 S.Ct. 17, 22, 63 L.Ed.2d 1173 (1919) (Holmes, J., dissenting). The "core value" of the first amendment's Free Speech Clause is the public's interest in unhindered debate on those matters considered important by the people, *Pickering v. Board of Education*, 391 U.S. 563, 573, 88 S.Ct. 1731, 1737, 20 L.Ed.2d 811 (1968), and there is a "profound national commitment to the principle that debate on public issues should be uninhibited, robust and wide open ...." *N.Y. Times v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964).

■ The plaintiff's response to questions asked of him at the Van Valkenburg hearing were not part of any ongoing debate on a public issue. Plaintiff put forth no ideas or opinions during his testimony. He was called upon only to state truthfully specific facts concerning the work of a subordinate. No inquiry was made of plaintiff regarding his associations, memberships, opinions or beliefs. It is the duty of every person to testify before a duly constituted tribunal unless a valid legal exemption is involved.

*Ullmann v. United States*, 350 U.S. 422, 439, n. 15, 76 S.Ct. 497, 507, n. 15, 100 L.Ed. 511 (1956). Plaintiff's duty was to testify under oath as to factual matters relating to Van Valkenburg's job performance.[5] That testimony was not protected by a first amendment privilege.

### IV

■ Even assuming that plaintiff's testimony was constitutionally protected, it is necessary that plaintiff show that the protected conduct was a substantial or motivating factor in his discharge from employment; if so, it is incumbent on the Court then to determine by a preponderance of the evidence whether Commissioner Maikels would have reached the decision to discharge plaintiff even in the absence of the protected conduct. *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). This Court finds and concludes that plaintiff's testimony at the Van Valkenburg hearing was not a substantial or motivating factor in his discharge and that the same decision would have been made in the absence of the assumed protected conduct.

Commissioner Maikels apparently was displeased with the initial union organizing effort at the Department of Public Works. He testified at the trial of this action that he thought that unions "interfered with the ability to do the job" and that he "should have the ultimate authority to hire and fire." Because Van Valkenburg was one of the first union organizers, Maikels directed plaintiff to keep a record of Van Valkenburg's absences. The record kept by plaintiff formed the basis for the charges made in the disciplinary hearing. Plaintiff's claim that he was not afforded the opportunity to read the charges is of little significance, since the charges reflected only the information originally furnished by plaintiff. Although plaintiff, at the hearing,

---

5. In *Ullmann v. United States, supra,* 350 U.S. at p. 439, n. 15, 76 S.Ct. at p. 507, the petitioner advanced the argument that some questions asked of him were objectionable because they called for testimony as to his political associations and memberships, matters "protected by the implications of the First Amendment." The Court declined to address the issue, since petitioner's counsel at the trial level made no claim of first amendment privilege, resting his refusal to answer before the grand jury on fifth amendment grounds.

disavowed certain of the information he had furnished to the Commissioner, it is not clear that plaintiff's testimony was the reason why no disciplinary action ever was taken against Van Valkenburg.

There is no question that Commissioner Maikels was disturbed by the testimony given by plaintiff. In June of 1975, some four months after the hearing, the Commissioner accused plaintiff of "stabbing him in the back" relative to the Van Valkenburg case. It is also clear from the record, however, that plaintiff's testimony at the hearing was not a substantial or motivating factor in his discharge. It was apparent to Commissioner Maikels and others in the Department, before the union organizing began, that plaintiff lacked the education and expertise to fulfill the duties required of a Deputy Commissioner. Approximately one month before the hearing, Michael Manning was hired at a salary in excess of plaintiff's because additional specialized assistance was required in the Department. George Nealon was brought up from the ranks because of his demonstrated ability. Plaintiff literally was a man "in over his head," unable to direct the functions of a modern public works department. Even as his duties were taken over by others, he had difficulty with the remaining tasks assigned to him. Finally, he was relegated to the City Hall cleaning crew and eventually discharged almost three years after the Van Valkenburg hearing. The decision to fire plaintiff was based on his inability to do the job, and that decision would have been made even in the absence of his testimony at the disciplinary hearing.

The action must be dismissed as against the late Mayor Corning in any event. Although the Mayor approved plaintiff's hiring, he had nothing to do with plaintiff's dismissal. The action also must be dismissed as against the City of Albany, since the doctrine of respondeat superior is not available in § 1983 actions, *Polk County v. Dodson,* 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981), and there is no indication that any constitutional violation took place with the City's authorization, approv-

al or encouragement, *Turpin v. Mailet,* 619 F.2d 196 (2d Cir.1980), *cert. denied* 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980). Plaintiff's § 1985 action is not maintainable in any event, since he has failed to demonstrate that he was the victim of a racial or other class-based animus. *See Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971).

### V

I direct the entry of judgment for the defendants in accordance with the foregoing. The motions made at the close of plaintiff's evidence, upon which decision was reserved, are denied in all respects.

### APPENDIX

### VI. STIPULATED FACTS

Unless otherwise stated, all stipulations apply at all times relevant to this action.

1. The transcript of testimony at the hearing on charges against Willard Van Valkenburg (Plaintiff's Exhibit 6) is a true, complete and accurate transcript of the questions asked and answers given at that hearing.

2. The transcript of testimony appearing as Plaintiff's Exhibit 15 for identification is a true, complete and accurate transcript of the questions asked and answers given before the Public Employment Relations Board on December 2, 1975 in Case No. U–1758.

3. Between 1942 and the present, the defendant Erastus Corning, II has been Mayor of the City of Albany.

4. Erastus Corning, II is presently unavailable as a witness as that term is defined in FRCP 32(a)(3) and FRE 804(a)(4) and the testimony given by him at a deposition held on December 3, 1981 qualifies as former testimony as that term is defined in FRE 804(b)(1).

5. The Commissioner of Public Works of the City of Albany reports directly to the Mayor.

6. From January 1, 1974 to the present, the defendant Harry F. Maikels has been

Commissioner of Public Works of the City of Albany.

7. Between January 1, 1974 and 1978, the Department of Public Works had Bureaus of Streets, Parks, Sanitation, Pumping Station, Landfill, Golf Course, Central Garage and Engineering (* * * Maikels, 68–84).

8. The Bureaus of Sanitation, Parks, Landfill and Golf Course each had a superintendent (* * * Maikels, 44).

9. The superintendents of the Bureaus of Sanitation, Parks, Landfill and Golf Course reported directly to the Commissioner of Public Works (* * * Maikels, 44).

10. The Superintendents of the Sanitation, Parks, Landfill and Golf Course were responsible within their bureaus for assigning and supervising work being performed by crews within their bureaus (* * * Maikels, 43–44).

11. The Bureau of Streets garage is located at 14 North Manning Boulevard, Albany, New York. The Bureau of Sanitation garage is a separate building located at 66 North Manning Boulevard, Albany, New York (* * * Maikels, 77).

12. Central Garage is an operation physically located at the Bureau of Sanitation garage. Central Garage performs routine maintenance on city vehicles other than police and fire vehicles.

13. The Superintendent of the Bureau of Sanitation was responsible for assigning work to employees at Central Garage.

14. The employees next in command below the Superintendents of the various bureaus within the Department of Public Works were Field Investigators and foremen. Their duties involved investigating complaints and areas in which work needed to be done within the jurisdiction of the bureau in which they worked. In addition, they supervised crews of Department of Public Works employees performing work within their respective bureaus (* * * Maikels, 44–45).

15. Immediately prior to his employment with the City of Albany, plaintiff was a bus driver. He had two months experience in construction work.

16. Plaintiff, Clarence A. Phelan, began his employment with the City of Albany on or about July 15, 1968.

17. Plaintiff's first job title was Chauffeur-Streets.

18. The major portion of plaintiff's duties as a Chauffeur consisted of driving street sweepers and trucks.

19. Plaintiff's rate of pay was $1.24 per hour through November 1, 1970 and $1.34 per hour from November 1, 1970 through July 3, 1972.

20. On or about July 3, 1972 plaintiff was promoted to the title of Field Investigator-Public Works.

21. His annual rate of pay in that position was $5,154.00.

22. On or about July 9, 1973 plaintiff was promoted to the title of Assistant Chief Field Investigator-Public Works.

23. The duties which plaintiff performed in that title were essentially the same as the duties which he performed in the title of Field Investigator. The change in title was in effect a pay raise.

24. Plaintiff's annual rate of pay as Assistant Chief Field Investigator-Public Works was $6,200.00 per year.

25. In the Fall of 1973, then Commissioner of Public Works Jesse Parker stated to plaintiff that he would be the new Deputy Commissioner upon the retirement in 1974 of then Deputy Commissioner Boels.

26. On or about January 10, 1974 plaintiff was promoted to the position of Deputy Commissioner-Public Works.

27. In a matter of the importance of who should be appointed Deputy Commissioner of Public Works, defendant Maikels checked with defendant Corning (* * * Maikels, 10).

28. Defendant Maikels sought and received defendant Corning's approval for the appointment of plaintiff as Deputy Commissioner-Public Works (* * * Maikels, 8–9).

29. Plaintiff's rate of pay as Deputy Commissioner-Public Works was $7,700.00 per year through November 1, 1974 and $8,000.00 per year through January 27, 1978.

30. Between January 10, 1974 and at least December 9, 1974 plaintiff determined priorities of work to be performed by employees of the Bureau of Streets and assigned the work to supervisors within that bureau. He assigned employees to work crews. Plaintiff inspected work in progress and completed work performed by Department of Public Works employees to determine whether the work was being properly performed and material being requisitioned was in fact being used in the work. He reviewed and executed employee time sheets used to compute the payroll for employees in all bureaus of the Department of Public Works except administration (* * * Maikels, 19). He maintained necessary inventories of tools, equipment and consumable material used by the Bureau of Streets. He requisitioned such items when necessary and filled orders from other bureaus or executed vouchers for outside labor and material used in all bureaus of the Department of Public Works (* * * Maikels, 19–31). At various times prior to plaintiff's termination in January, 1978 each of the duties set forth in this paragraph were removed from him. The parties dispute the dates upon which each of the above duties were removed from plaintiff.

31. The Deputy Commissioner-Public Works had an office from which he made assignments and at which he performed his administrative duties. The office was located at the Bureau of Streets garage at 14 North Manning Boulevard.

32. Each of the bureaus within the Department of Public Works had a timekeeper (* * * Maikels, 45–46).

33. Employees reporting for work reported initially to the timekeeper in their respective bureaus.

34. During 1974 and 1975 in the Department of Public Works if an employee reported for work after a period of absence he would be required to present a note from a doctor stating that he was able to return to work if he had been absent in excess of three days. The employee would not be permitted to return to work without such a note (* * * Maikels, 48–49).

35. Prior to the transfer of Water Department machinery to the Bureau of Streets garage, the Department of Public Works contracted out excavation work such as that required to repair sewer line malfunctions and associated cave-ins, since it did not have the machinery or personnel capable of such excavation.

36. Michael C. Manning began work for the City of Albany Department of Public Works from on or about December 9, 1974. His job title was Field Investigator. On or about January 21, 1975 his job title was changed to Deputy Field Commissioner. He terminated his work with the City of Albany Department of Public Works on or about May 7, 1976.

37. All of Michael C. Manning's work was performed in the Bureau of Streets.

38. Although Michael C. Manning reported directly to Harry Maikels, he received some of his daily assignments from a box with his name on it in plaintiff's office at the Bureau of Streets garage.

39. Approximately 90% of Michael C. Manning's work involved inspecting locations at which sewer lines were malfunctioning, determining whether the required repairs were within the capabilities of the Department of Public Works and overseeing crews performing such repairs. Approximately 10% of his duties involved inspection of other types of repair work performed by Bureau of Streets crews and supervision of that work.

40. In the case of repairs within the capability of the Bureau of Streets, Michael Manning notified plaintiff of the job location, work involved, personnel and machinery required to perform the work and requested assignment of the personnel and machinery.

41. On a Saturday in late September or early October, 1974, prior to the existence

of Plaintiff's Exhibit 1, George Strokes appeared at the Bureau of Streets garage and solicited employees of the Department of Public Works to join Council 66, American Federation of State, County and Municipal Employees, AFL–CIO (hereinafter the union).

42. At or about October 21, 1974, the defendants Maikels and Corning saw Plaintiff's Exhibit 1 (* * * PERB, 324).

43. On or about November 12, 1974, defendant Maikels discharged George Strokes without a hearing.

44. On or about November 22, 1974, an improper practice proceeding was commenced before the New York State Public Employment Relations Board challenging the discharge of George Strokes.

45. On or about December 6, 1974, a proceeding pursuant to N.Y. CPLR Article 78 was commenced in New York State Supreme Court challenging the discharge of George Strokes.

46. On or about December 30, 1974, Plaintiff's Exhibit 2 was executed settling the improper practice proceeding and the Article 78 proceeding. Pursuant to Plaintiff's Exhibit 2, George Strokes returned to work.

47. In the Spring of 1982 George Strokes was terminated from his position with the Department of Public Works upon recommendation of a hearing officer.

48. On January 20, 21, 22, 23, 24, 27, 28, 29, 30 and 31, 1975 Willard Van Valkenburg did not work.

49. Defendant Maikels told plaintiff to make note of the days on which Willard Van Valkenburg did not appear for work.

50. Pursuant to defendant Maikels' orders, plaintiff produced the documents appearing as Plaintiff's Exhibit 3.

51. On each day of Willard Van Valkenburg's absence, George Strokes was ordered to operate backhoe number 140, the equipment which Mr. Van Valkenburg normally operated.

52. George Strokes had not previously been required to operate backhoe number 140.

53. On each day of Willard Van Valkenburg's absence, George Strokes refused to operate backhoe number 140, claiming that his assignment to that equipment violated the agreement set forth in Plaintiff's Exhibit 2 and was assigned no other work on those days.

54. On or shortly after February 3, 1975, defendant Maikels had in his possession all of the documents comprising Plaintiff's Exhibit 3 (* * * Maikels, 49–50).

55. The formal charges against Van Valkenburg were prepared upon the basis of the information contained in Plaintiff's Exhibit 3.

56. Plaintiff was called as a witness at the hearing on Willard Van Valkenburg's charges conducted on February 26, 1975.

57. On February 26, 1975, plaintiff testified as set forth in Plaintiff's Exhibit 6 at pages 18–99.

58. As of December, 1975 Willard Van Valkenburg was the only employee of the Department of Public Works against whom discipline or discharge pursuant to Civil Service Law § 75 had been sought for absence due to a claim of illness (* * * Maikels-PERB, 341–343).

59. As of December, 1975 the only two people against whom the Department of Public Works had ever preferred charges and conducted hearings pursuant to N.Y. Civil Service Law § 75 were George Strokes and Willard Van Valkenburg (* * * Maikels-PERB, 318, 357–358).

60. Harry Maikels sought to dismiss Willard Van Valkenburg on charges arising out of his failure to appear at work between January 20 and January 31, 1975 (* * * Maikels, 164–165).

61. On March 7, 1975 when Harry Maikels testified at the disciplinary hearing of Willard Van Valkenburg, he did not know the substance of plaintiff's testimony given at that hearing on February 26, 1975 (* * * Van, 191, 193; and Maikels, 64).

62. Plaintiff's Exhibit 5 was the only charge under the Civil Service Law ever brought against Willard Van Valkenburg.

63. On January 20, 1982 defendant Maikels was asked and gave under oath the answers which appear in Plaintiff's Exhibit 13 referring to whether a decision had been rendered on the charges against Willard Van Valkenburg.

64. On December 2, 1975 defendant Maikels was asked and gave under oath the answers to the questions which appear in Plaintiff's Exhibit 14. The defendants stipulate to the facts contained in this paragraph if and only if the Court determines that Plaintiff's Exhibit 14 is admissible and the Court determines that the facts contained in Plaintiff's Exhibit 14 are a proper subject for impeachment.

65. Willard Van Valkenburg was not paid for the days in January, 1975 when he did not work; however, no disciplinary penalty or adverse consequences of any sort other than not paying him for the days not worked were ever imposed upon him.

66. On or about July 18, 1975 the pay of Field Investigators Michael Pestuglicci and Thomas Breslin was increased from $5,854.00 to $6,854.00 per year. The pay of Michael Manning, as Deputy Field Commissioner, which had been $10,000.00 per year since on or about January 28, 1975 was increased to $11,000.00 per year on or about July 18, 1975. Plaintiff's pay remained at $8,000.00.

67. At or about the end of October, 1975, just prior to the Veteran's Day parade, defendant Maikels in a radio transmission ordered plaintiff to return to his desk at the Bureau of Streets garage and remain there.

68. At or about the end of October, 1975, plaintiff lost the use of his city-owned car because defendant Maikels had ordered him to remain at his desk at the Bureau of Streets garage.

69. From the time of defendant Maikels' order, plaintiff remained at his desk at the Bureau of Streets garage and continued to assign work pursuant to requests received from Manning, Maikels and others to Bureau of Streets crews from that location. In addition he continued to execute vouchers, payroll records and perform the other administrative duties which he had previously performed. These functions were eventually taken over by George Nealon.

70. On or about April 23, 1976 the titles of Merrill Mosley, Thomas Breslin and Michael Pestuglicci were changed to Highway Foreman. The pay of Thomas Breslin and Merrill Mosley was increased from $6,854.00 to $7,654.00; and the pay of Michael Pestuglicci was increased from $6,854.00 to $7,854.00. Plaintiff's pay remained the same (* * * 7–1–J, 7–3–C).

71. On or about April 29, 1976 defendant Maikels assigned plaintiff to City Hall to supervise the cleaning crew. The cleaning crew had a supervisor at the time who continued as the supervisor even after plaintiff's assignment (* * * Maikels, 212, 219).

72. Defendant Maikels assigned plaintiff to the small office of the cleaning crew supervisor in the basement of City Hall.

73. On or about December 31, 1976 defendant Maikels, with the knowledge and consent of defendant Corning, promoted George Nealon from Highway Foreman-Sewer to Acting Deputy Commissioner at an annual rate of pay of $9,000.00 per year while plaintiff continued to serve as Deputy Commissioner at an annual rate of pay of $8,000.00 per year (* * * 7–1–O, 7–2–E).

74. On or about December 16, 1977 defendant Maikels, with the knowledge and consent of defendant Corning, increased the rate of pay of Acting Deputy Commissioner Nealon to $16,000.00 per year while plaintiff continued to serve as Deputy Commissioner at an annual rate of pay of $8,000.00 per year.

75. On or about December 16, 1977 defendant Maikels, with the knowledge and consent of defendant Corning, increased the rate of pay of Highway Foremen Pestuglicci and Mosley to $11,000.00 per year while plaintiff continued to serve as Deputy Com-

missioner at an annual rate of pay of $8,000.00 per year.

76. During calendar year 1975, plaintiff's gross pay was $9,800.90 (Exhibit 7–1–H).

77. During calendar year 1976, plaintiff's gross pay was $8,719.45. During calendar year 1977, plaintiff's gross pay was $8,250.00. During calendar year 1978, plaintiff's gross earnings were $1,855.00. In addition, during calendar year 1978 plaintiff received the sum of $3,034.00 in unemployment compensation.

78. The difference between plaintiff's rate of pay and that of Michael Manning between July 18, 1975 and January 2, 1976 was $1,384.56.

79. During calendar year 1976 the difference between plaintiff's rate of pay and that of Michael Manning was $3,000.00.

80. The difference between the rate of pay of plaintiff and George Nealon between December 9, 1977 and January 27, 1978 was $1,076.88.

81. From January 27, 1978 through December 31, 1978 George Nealon, acting as Deputy Commissioner of the Department of Public Works, earned the sum of $15,644.08. In calendar year 1979 George Nealon, Deputy Commissioner of the Department of Public Works, earned the sum of $18,662.57. In 1980 George Nealon, Deputy Commissioner of the Department of Public Works, earned the sum of $21,113.34.

82. In 1981 George Nealon, acting as Deputy Commissioner of the Department of Public Works, earned the sum of $21,143.64. In 1982 George Nealon, acting as Deputy Commissioner of the Department of Public Works, earned the sum of $25,026.71. During 1983 the budgeted salary for the Deputy Commissioner of Public Works is $25,765.00.

83. In 1979 plaintiff earned the sum of $8,663.70. In 1980 plaintiff earned the sum of $8,774.44. In 1981 plaintiff earned the sum of $12,067.41. In 1982 plaintiff earned the sum of $11,952.12.

84. On January 20, 1982 defendant Harry F. Maikels was asked the questions and gave under oath the answers which appear in Plaintiff's Exhibit 7.

85. On January 20, 1982 defendant Maikels was asked the questions and gave under oath the answers to the questions appearing in Plaintiff's Exhibit 8.

86. On January 20, 1982 defendant Maikels was asked the questions and gave under oath the answers to the questions appearing in Plaintiff's Exhibit 9.

87. On January 20, 1982 defendant Maikels was asked the questions and gave under oath the answers to the questions appearing in Plaintiff's Exhibit 10.

88. On March 7, 1975 defendant Maikels was asked the questions and gave under oath the answers to the questions appearing in Plaintiff's Exhibit 11.

89. On March 7, 1975 defendant Maikels was asked the questions and gave under oath the answers to the questions appearing in Plaintiff's Exhibit 12.

90. In January, 1978 plaintiff made application for worker's compensation benefits and for accidental disability retirement benefits.

91. In response to defendants' interrogatories, plaintiff stated:

"The sum and substance of the differences between the facts alleged in the charges against Willard Van Valkenburg and those known by plaintiff to be true are as follows:

The following facts alleged in the charge are in error:

'On Monday, January 27, 1975 he reported for work, advising me that he had been sick on the above dates. I sent him home with instructions to furnish me with a doctor's certification to that effect.'

The facts known by plaintiff to be true and which plaintiff stated at the hearing were that to the best of his knowledge Willard Van Valkenburg did not physically appear at work on January 27, 1975. Upon information and belief, he phoned the Department of Public Works and spoke with the timekeeper. Upon infor-

mation and belief, pursuant to standing orders from plaintiff, the timekeeper informed Willard Van Valkenburg that he would need to get a doctor's note authorizing him to return to work."

92.   In response to defendants' interrogatories seeking all of the written communications between plaintiff and defendant Maikels concerning the absence of Willard Van Valkenburg, the plaintiff's response contained all of the documents contained in Plaintiff's Exhibit 3 except the letter dated January 27, 1975.