# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 6, 2006          Decided May 8, 2007

No. 05-5359

WE THE PEOPLE FOUNDATION, INC., ET AL.,
APPELLANTS

v.

UNITED STATES OF AMERICA, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 04cv01211)

*Mark Lane* argued the cause for appellants. With him on the briefs was *Robert L. Schulz*, pro se.

*Carol Barthel*, Attorney, U.S. Department of Justice, argued the cause for appellees. With her on the brief were *Kenneth L. Wainstein*, U.S. Attorney at the time the brief was filed, and *Kenneth L. Greene*, Attorney. *Bruce R. Ellisen* and *Kenneth W. Rosenberg*, Attorneys, entered appearances.

Before: GINSBURG, *Chief Judge*, and ROGERS and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* KAVANAUGH, in which *Chief Judge* GINSBURG and *Circuit Judge* ROGERS join.

Concurring opinion filed by *Circuit Judge* ROGERS.

KAVANAUGH, *Circuit Judge*: Ratified in 1791, the First Amendment to the United States Constitution provides in part that "Congress shall make no law . . . abridging . . . the right of the people . . . to petition the Government for a redress of grievances." Plaintiffs are citizens who petitioned various parts of the Legislative and Executive Branches for redress of a variety of grievances that plaintiffs asserted with respect to the Government's tax, privacy, and war policies. Alleging that they did not receive an adequate response, plaintiffs sued to compel a response from the Government.

Plaintiffs contend that the First Amendment guarantees a citizen's right to receive a government response to or official consideration of a petition for redress of grievances. Plaintiffs' argument fails because, as the Supreme Court has held, the First Amendment does not encompass such a right. *See Minn. State Bd. for Cmty. Colls. v. Knight*, 465 U.S. 271, 283, 285 (1984); *Smith v. Arkansas State Highway Employees*, 441 U.S. 463, 465 (1979).

I

Plaintiffs are numerous individuals and an organization that creatively calls itself "We the People." For purposes of this appeal, we take the allegations in the complaint as true. According to plaintiffs, they have engaged since 1999 in "a nationwide effort to get the government to answer specific

questions" regarding what plaintiffs view as the Government's "violation of the taxing clauses of the Constitution" and "violation of the war powers, money and 'privacy' clauses of the Constitution." Joint Appendix ("J.A.") 80 (Am. Compl. ¶ 3). Plaintiffs submitted petitions with extensive lists of inquiries to various government agencies. On March 16, 2002, for example, plaintiffs submitted a petition with hundreds of inquiries regarding the tax code to a Member of Congress and to various parts of the Executive Branch, including the Department of Justice and the Department of the Treasury. On November 8, 2002, plaintiffs presented four petitions to each Member of Congress. Those petitions concerned the Government's war powers, privacy issues, the Federal Reserve System, and the tax code. On May 10, 2004, plaintiffs submitted a petition regarding similar issues to the Executive Branch, including the Department of Justice and the Department of the Treasury.

Plaintiffs contend that the Legislative and Executive Branches have responded to the petitions with "total silence and a lack of acknowledgment." J.A. 85 (Am. Compl. ¶ 35). In protest, some plaintiffs have stopped paying federal income taxes.

Based on their view that the Government has not sufficiently responded to their petitions, plaintiffs filed suit in the United States District Court for the District of Columbia. They raised two claims. First, plaintiffs contend that the Government violated their First Amendment right to petition the Government for a redress of grievances by failing to adequately respond to plaintiffs' petitions. In particular, plaintiffs contend that the President, the Attorney General, the Secretary of the Treasury, the Commissioner of the Internal Revenue Service, and Congress neglected their responsibilities under the First Amendment to respond to plaintiffs' petitions. Plaintiffs want the Government to enter into "good faith exchanges" with

plaintiffs and to provide "documented and specific answers" to the questions posed in the petitions.  J.A. 78 (Am. Compl.).

Second, plaintiffs claim that government officials – by seeking to collect unpaid taxes – have retaliated against plaintiffs' exercise of First Amendment rights.  Plaintiffs therefore asked the District Court to enjoin the Internal Revenue Service, the Department of Justice, and other federal agencies from retaliating against plaintiffs' exercise of their constitutional rights (in other words, to prevent the Government from collecting taxes from them).

The Government has responded that the federal courts lack jurisdiction over either claim because the Government has not waived its sovereign immunity with respect to the causes of action asserted by plaintiffs.  As to the Petition Clause claim, the Government has contended in the alternative that plaintiffs have failed to state a claim for which relief could be granted because the Petition Clause does not require the Government to respond to or officially consider petitions.

The District Court dismissed plaintiffs' complaint.  *We The People v. United States*, No. 04-cv-1211, slip op. at 6 (D.D.C. Aug. 31, 2005).  The Court ruled that the First Amendment does not provide plaintiffs with the right to receive a government response to or official consideration of their petitions.  *Id.* at 2-3. In addition, the District Court concluded that the Anti-Injunction Act bars plaintiffs' claim for injunctive relief with respect to the collection of taxes.  *See id.* at 5 (citing 26 U.S.C. § 7421).

II

Plaintiffs raise two legal arguments on appeal.  First, plaintiffs contend that they have a First Amendment right to receive a government response to or official consideration of

their petitions. Second, plaintiffs argue that they have the right to withhold payment of their taxes until they receive adequate action on their petitions.

The Government renews its argument that plaintiffs' claims are barred by sovereign immunity. In response, plaintiffs have contended that Section 702 of the Administrative Procedure Act waives the Government's sovereign immunity. That section provides: "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. . . . The United States may be named as a defendant in any such action . . . ." 5 U.S.C. § 702. The Government acknowledges that Section 702 waives sovereign immunity from suits for injunctive relief. *See Dep't of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 260-61 (1999) (describing Section 702 as waiving the Government's immunity from actions seeking relief other than money damages); *Trudeau v. FTC*, 456 F.3d 178, 186 (D.C. Cir. 2006) ("[T]here is no doubt that § 702 waives the Government's immunity from actions seeking relief other than money damages.") (internal quotation omitted). The Government contends, however, that plaintiffs' claims fall within an exception to Section 702 that provides: "Nothing herein . . . affects other limitations on judicial review . . . ." 5 U.S.C. § 702. The Government further argues that the Anti-Injunction Act presents just such a barrier to judicial relief in this case because of the Act's provision that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person." 26 U.S.C. § 7421(a).

We agree with the Government that the Anti-Injunction Act precludes plaintiffs' second claim – related to collection of taxes. *See Bob Jones Univ. v. Simon*, 416 U.S. 725, 726-27, 749-50 (1974). In asserting that claim, plaintiffs seek to restrain

the Government's collection of taxes, which is precisely what the Anti-Injunction Act prohibits, notwithstanding that plaintiffs have couched their tax collection claim in constitutional terms. *See Alexander v. "Americans United" Inc.*, 416 U.S. 752, 759-60 (1974).

Plaintiffs also raise, however, a straight First Amendment Petition Clause claim – namely, that they have a right to receive a government response to or official consideration of their various petitions. By its terms, the Anti-Injunction Act does not bar that claim, and Section 702 waives the Government's sovereign immunity from this suit for injunctive relief, at least with respect to plaintiffs' allegations regarding actions of certain of the named defendants. *See* 26 U.S.C. § 7421; *cf. Trudeau*, 456 F.3d at 187. We therefore will consider that claim on the merits.

### III

The First Amendment to the Constitution provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. CONST. amend. I. Plaintiffs contend that they have a right under the First Amendment to receive a government response to or official consideration of a petition for a redress of grievances. We disagree.

In cases involving petitions to state agencies, the Supreme Court has held that the Petition Clause does not provide a right to a response or official consideration. In *Smith v. Arkansas State Highway Employees*, for example, state highway commission employees argued that a state agency violated the First Amendment by not responding to or considering

grievances that employees submitted through their union. *See* 441 U.S. 463, 463-64 & n.1 (1979). In response, the Court held that "the First Amendment does not impose any affirmative obligation on the government to listen, to respond or, in this context, to recognize the association and bargain with it." *Id.* at 465.

Likewise, in *Minnesota State Board for Community Colleges v. Knight*, the Supreme Court evaluated a state law that required public employers to discuss certain employee matters exclusively with a union representative; this prevented nonunion employees from discussing those matters with their employers. 465 U.S. 271, 273 (1984). Holding that the state statutory scheme had not "unconstitutionally denied an opportunity to participate in their public employer's making of policy," the Court reiterated: "Nothing in the First Amendment or in this Court's case law interpreting it suggests that the rights to speak, associate, and petition require government policymakers to listen or respond to individuals' communications on public issues." *Id.* at 285, 292. Therefore, the Court concluded that individuals "have no constitutional right as members of the public to a government audience for their policy views." *Id.* at 286.

Plaintiffs contend that *Smith* and *Knight* do not govern their claims in this case because those cases addressed petitions to state officials regarding public policy, not claims that the Federal Government has violated the Constitution. Plaintiffs' attempted distinction is at best strained. In both cases, the Supreme Court flatly stated that the First Amendment, which has been incorporated against the States by the Fourteenth Amendment, does not provide a right to a response to or official consideration of a petition. *Knight*, 465 U.S. at 285; *Smith*, 441 U.S. at 465. Nothing in the two Supreme Court opinions hints at a limitation on their holdings to *certain* kinds of petitions or

*certain* levels of Government. In short, the Supreme Court precedents in *Smith* and *Knight* govern this case.

IV

Plaintiffs cite the work of several commentators who suggest that *Smith* and *Knight* overlooked important historical information regarding the right to petition. Those commentators point to the government practice of considering petitions in some quasi-formal fashion from the 13th century in England through American colonial times – a practice that continued in the early years of the American Republic. Based on this historical practice, plaintiffs and these commentators contend that the Petition Clause should be interpreted to incorporate a right to a response to or official consideration of petitions. *See, e.g.*, Stephen A. Higginson, *A Short History of the Right to Petition Government for the Redress of Grievances*, 96 YALE L.J. 142, 155 (1986); James E. Pfander, *Sovereign Immunity and the Right to Petition: Toward a First Amendment Right to Pursue Judicial Claims Against the Government*, 91 Nw. U. L. REV. 899, 904-05 & n.22 (1997); Julie M. Spanbauer, *The First Amendment Right to Petition Government for a Redress of Grievances: Cut From a Different Cloth*, 21 HASTINGS CONST. L.Q. 15, 17-18 (1993); Note, *A Petition Clause Analysis of Suits Against the Government: Implications for Rule 11 Sanctions*, 106 HARV. L. REV. 1111, 1116-18 (1993); *cf.* David C. Frederick, *John Quincy Adams, Slavery, and the Disappearance of the Right of Petition*, 9 LAW & HIST REV. 113, 116-18, 141 (1991).

Other scholars disagree, arguing based on the plain text of the First Amendment that the "right to petition the government for a redress of grievances really is just a right to petition the government for a redress of grievances." Gary Lawson & Guy Seidman, *Downsizing the Right to Petition*, 93 Nw. U. L. REV.

739, 766 (1999); *cf.* Norman B. Smith, *"Shall Make No Law Abridging . . .": An Analysis of the Neglected, but Nearly Absolute, Right of Petition*, 54 U. CIN. L. REV. 1153, 1190-91 (1986).  These scholars note that the Petition Clause by its terms refers only to a right "to petition"; it does not also refer to a right to response or official consideration.  *See* N. BAILEY, AN UNIVERSAL ETYMOLOGICAL ENGLISH DICTIONARY (24th ed. 1782) ("To petition": "to present or put up a Petition"); S. JOHNSON, A DICTIONARY OF THE ENGLISH LANGUAGE (6th ed. 1785) ("To petition": "To solicite; to supplicate").  As they suggest, moreover, the Framers and Ratifiers did not intend to incorporate every historical practice of British or colonial governments into the text of the Constitution.  *See* Lawson & Seidman, 93 Nw. U. L. REV. at 756-57; *cf. Williams v. Florida*, 399 U.S. 78, 92-93 (1970); *Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 274-76 (1989) ("Despite this recognition of civil exemplary damages as punitive in nature, the Eighth Amendment did not expressly include it within its scope.").

We need not resolve this debate, however,  because we must follow the binding Supreme Court precedent.  *See Tenet v. Doe*, 544 U.S. 1, 10-11 (2005).  And under that precedent, Executive and Legislative responses to and consideration of petitions are entrusted to the discretion of those Branches.

The judgment of the District Court is affirmed.

*So ordered*.

ROGERS, *Circuit Judge*, concurring: The text of the Petition Clause of the First Amendment does not explicitly indicate whether the right to petition includes a right to a response. Appellants ask the court to consider the text in light of historical evidence of how the right to petition was understood at the time the First Amendment was adopted. Essentially, they contend that the Petition Clause should be read in light of contemporary understanding, which they suggest indicates that the obligation to respond was part and parcel of the right to petition.

As the court points out, we have no occasion to resolve the merits of appellants' historical argument, given the binding Supreme Court precedent in *Smith v. Arkansas State Highway Employees*, 441 U.S. 463 (1979), and *Minnesota State Board for Community Colleges v. Knight*, 465 U.S. 271 (1984). Op. at 9. That precedent, however, does not refer to the historical evidence and we know from the briefs in *Knight* that the historical argument was not presented to the Supreme Court.

The Supreme Court's interpretation of the Constitution has been informed by the understanding that:

> "The provisions of the Constitution are not mathematical formulas having their essence in their form; they are organic living institutions transplanted from English soil. Their significance is vital not formal; it is to be gathered not simply by taking the words and a dictionary, but by considering their origin and the line of their growth."

*Konigsberg v. State Bar of California*, 366 U.S. 36, 50 n.10 (1961) (quoting *Gompers v. United States*, 233 U.S. 604, 610 (1914)). Even where the plain text yields a clear interpretation, the Supreme Court has rejected a pure textualist approach in favor of an analysis that accords weight to the historical context and the underlying purpose of the clause at issue. For example,

in *Lynch v. Donnelly*, 465 U.S. 668 (1984), the Supreme Court stated that "[t]he history may help explain why the Court consistently has declined to take a rigid, absolutist view of the Establishment Clause. We have refused 'to construe the Religion Clauses with a literalness that would undermine the ultimate constitutional objective *as illuminated by history*.'" *Id.* at 678 (quoting *Walz v. Tax Comm'n*, 397 U.S. 664, 671 (1970)); *see id.* at 673-75. Nor is the Supreme Court's rejection of literalism limited to the First Amendment.[1]

---

[1] For instance, in Eleventh Amendment cases, the Supreme Court has rejected "ahistorical literalism," *Alden v. Maine*, 527 U.S. 706, 730 (1999), and instead has turned to "history, practice, precedent, and the structure of the Constitution," *id.* at 741; *see id.* at 711-24, 730-35, 741-44, explaining that "[a]lthough the text of the Amendment would appear to restrict only the Article III diversity jurisdiction of the federal courts, 'we have understood the Eleventh Amendment to stand not so much for what it says, but for the presupposition . . . which it confirms,'" *id.* at 729 (omission in original) (quoting *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 54 (1996) (quoting *Blatchford v. Native Village of Noatak*, 501 U.S. 775, 779 (1991))); *see also Seminole Tribe*, 517 U.S. at 69-70; *Principality of Monaco v. Mississippi*, 292 U.S. 313, 320-26, 330 (1934); *Hans v. Louisiana*, 134 U.S. 1, 10-11, 15 (1890). In construing the Fifth Amendment in *Ullmann v. United States*, 350 U.S. 422, 424-25, 438-39 (1956), the Supreme Court rejected the contention that the privilege against self-incrimination protects an individual who is given immunity from prosecution from being forced to testify before a grand jury: For "the privilege against self-incrimination[,] . . . it is peculiarly true that 'a page of history is worth a volume of logic.' For the history of the privilege establishes not only that it is not to be interpreted literally, but also that its sole concern is . . . with the danger to a witness forced to give testimony" that may lead to criminal charges. *Id.* at 438-39 (internal quotation marks omitted) (citations omitted) (quoting *New York Trust Co. v. Eisner*, 256 U.S. 345, 349 (1921)). And in interpreting the *Ex Post Facto* Clause, the Supreme Court in *Collins v. Youngblood*, 497 U.S.

In the context of the First Amendment, the Supreme Court has repeatedly emphasized the significance of historical evidence. A few examples suffice to illustrate the point. In *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596 (1982), the Supreme Court acknowledged that:

> [The] right of access to criminal trials [by the press] is not explicitly mentioned in terms in the First Amendment. But we have long eschewed any narrow, literal conception of the Amendment's terms, for the Framers were concerned with broad principles, and wrote against a background of shared values and practices. The First Amendment is thus broad enough to encompass those rights that, while not

---

37 (1990), relied on history rather than adopting a literal construction:

> Although the Latin phrase "*ex post facto*" literally encompasses any law passed "after the fact," it has long been recognized by this Court that the constitutional prohibition on *ex post facto* laws applies only to penal statutes which disadvantage the offender affected by them. As early opinions in this Court explained, "*ex post facto* law" was a term of art with an established meaning at the time of the framing of the Constitution.

*Id.* at 41 (internal citations omitted) (citing *Calder v. Bull*, 3 Dall. 386 (1798)); *see Minnesota v. Carter*, 525 U.S. 83, 88-89 (1998); *Maryland v. Craig*, 497 U.S. 836, 844-49 (1990); *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 502-03 (1987); *Goldstein v. Califoria*, 412 U.S. 546, 561-62 (1973); *Gravel v. United States*, 408 U.S. 606, 616-18 (1972); *Wright v. United States*, 302 U.S. 583, 607 (1938) (Stone, J., concurring); *Olmstead v. United States*, 277 U.S. 438, 476-77 (1928) (Brandeis, J., dissenting); *Boyd v. United States*, 116 U.S. 616, 634-35 (1886).

> unambiguously enumerated in the very terms of the Amendment, are nonetheless necessary to the enjoyment of other First Amendment rights.

*Id.* at 604 (internal quotations marks omitted) (citations omitted). In *Lynch v. Donnelly*, the Supreme Court acknowledged that its "interpretation of the Establishment Clause has comported with what history reveals was the contemporaneous understanding of its guarantees." 465 U.S. at 673; *see id.* at 673-77. In *Marsh v. Chambers*, 463 U.S. 783, 786-94 (1983), the Supreme Court looked to contemporary practice from the early sessions of Congress and to later congressional practice in holding that paid legislative chaplains and opening prayers do not violate the First Amendment. *See Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 583-85 (1983); *Engel v. Vitale*, 370 U.S. 421, 425-33 (1962); *Everson v. Bd. of Educ.*, 330 U.S. 1, 7-15 (1947); *Grosjean v. Am. Press Co.*, 297 U.S. 233, 240, 245-49 (1936); *Near v. Minnesota*, 283 U.S. 697, 713-18 (1931).[2]

Appellants point to the long history of petitioning and the importance of the practice in England, the American Colonies, and the United States until the 1830's as suggesting that the right to petition was commonly understood at the time the First Amendment was proposed and ratified to include duties of consideration and response. *See* Julie M. Spanbauer, *The First*

---

[2] Similar analysis is found in the Supreme Court's interpretation of other provisions of the Constitution. *See Crawford v. Washington*, 541 U.S. 36, 42-50 (2004) (Sixth Amendment); *Atwater v. City of Lago Vista*, 532 U.S. 318, 326-40, 345 n.14 (2001) (Fourth Amendment); *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 782-83, 800-15 (1995) (Tenth Amendment); *Harmelin v. Michigan*, 501 U.S. 957, 975-85 (1991) (Eighth Amendment); *Wesberry v. Sanders*, 376 U.S. 1, 2-3, 7-17 (1964) (Art. I, § 2).

*Amendment Right to Petition Government for a Redress of Grievances: Cut From a Different Cloth*, 21 HASTINGS CONST. L.Q. 15, 22-33 (1993); Norman B. Smith, *"Shall Make No Law Abridging . . .": An Analysis of the Neglected, but Nearly Absolute, Right of Petition*, 54 U. CIN. L. REV. 1153, 1154-68, 1170-75 (1986). Based on the historical background of the Petition Clause, "most scholars agree that the right to petition includes a right to some sort of considered response." James E. Pfander, *Sovereign Immunity and the Right to Petition: Toward a First Amendment Right to Pursue Judicial Claims Against the Government*, 91 NW. U. L. REV. 899, 905 n.22 (1997); *see* David C. Frederick, *John Quincy Adams, Slavery, and the Right of Petition*, 9 LAW & HIST. L. REV. 113, 141 (1991); Spanbauer, *supra*, at 40-42; Stephen A. Higginson, Note, *A Short History of the Right to Petition*, 96 YALE L.J. 142, 155-56 (1986); Note, *A Petition Clause Analysis of Suits Against the Government: Implications for Rule 11 Sanctions*, 106 HARV. L. REV. 1111, 1116-17, 1119-20 (1993); *see also* Akhil Reed Amar, *The Bill of Rights as a Constitution*, 100 YALE L.J. 1131, 1156 (1991) (lending credence to Higginson's argument that the Petition Clause implies a duty to respond). Even those who take a different view, based on a redefinition of the question and differences between English and American governments, acknowledge that there is "an emerging consensus of scholars" embracing appellants' interpretation of the right to petition. *See* Gary Lawson & Guy Seidman, *Downsizing the Right to Petition*, 93 NW. U. L. REV. 739, 756 (1999).

The sources cited by appellants indicate that "[t]he debates over the inclusion of the right to petition reveal very little about why the convention delegates may have regarded the right as important or what the 'framers' intended with respect to the substantive meaning of the right." Frederick, *supra*, at 117 n.19 (citing 4 BERNARD SCHWARTZ, THE ROOTS OF THE BILL OF RIGHTS 762-66, 840-42 (1980)); *see* Higginson, *supra*, at 155-

56. But neither textual omission[3] nor the absence of explicit statements by Framers or Ratifiers on the precise issue has been dispositive in the Supreme Court's First Amendment jurisprudence. Instead, the historical context and the underlying purpose have been the hallmarks of the Supreme Court's approach to the First Amendment. *See, e.g.*, *Buckley v. Valeo*, 424 U.S. 1, 14-15 (1976); *New York Times Co. v. Sullivan*, 376 U.S. 254, 269-71 (1964); *Roth v. United States*, 354 U.S. 476, 481-84, 488 (1957); *Beauharnais v. Illinois*, 343 U.S. 250, 254-55 (1952).

The Supreme Court's free speech precedent is illustrative. Although the textual meaning of "speech" is as clear, in terms of dictionary definitions, as the meaning of "petition," the Supreme Court has interpreted "speech" broadly in order to protect freedom of expression:

The First Amendment literally forbids the abridgment

---

[3] *See, e.g.*, *Globe Newspaper*, 457 U.S. at 604. The Supreme Court has adopted the same approach in interpreting other provisions of the Constitution. For example, in holding that the Speech or Debate Clause applies to a Senator's aide even though it mentions only "Senators and Representatives," the Supreme Court in *Gravel* observed that although the Clause "speaks only of 'Speech or Debate,'" its precedent, consistent with adhering to the underlying purpose of the Clause, "ha[d] plainly not taken a literalistic approach in applying the privilege" to protect committee reports, resolutions, and voting. *Gravel*, 408 U.S. at 617; *see id.* at 616-18. In the Fourth Amendment context, although the Amendment speaks only to protecting people in their houses, the Supreme Court in *Carter* noted that its precedent, in some situations, had extended that protection to apply to individuals' privacy in other people's houses. *Carter*, 525 U.S. at 88-89; *see also Faretta v. California*, 422 U.S. 806, 819 & n.15 (1975); *Goldstein*, 412 U.S. at 561-62; *Principality of Monaco*, 292 U.S. at 320-23, 330; *Hans*, 134 U.S. at 10-11, 15.

> only of "speech," but we have long recognized that its protection does not end at the spoken or written word . . . . [W]e have acknowledged that conduct may be "sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments."

*Texas v. Johnson*, 491 U.S. 397, 404 (1989) (quoting *Spence v. Washington*, 418 U.S. 405, 409 (1974)); *cf. NAACP v. Button*, 371 U.S. 415, 430 (1963). The text of the First Amendment mentions neither writing nor conduct, and at the time of the Founding, as now, the word "speech" meant expression through "vocal words."[4] Yet the Supreme Court has considered both the

---

[4] 2 SAMUEL JOHNSON, A DICTIONARY OF THE ENGLISH LANGUAGE (6th ed. 1785) ("speech": "The power of articulate utterance; the power of expressing thoughts by vocal words," "Language; words considered as expressing thoughts," "Particular language; as distinct from others," "Any thing spoken," "Talk; mention," "Oration, harangue," "Declaration of thoughts"); 2 THOMAS SHERIDAN, A COMPLETE DICTIONARY OF THE ENGLISH LANGUAGE (3d ed. 1790) ("speech": "The power of articulate utterance, the power of expressing thoughts by vocal words; language, words considered as expressing thoughts; particular language as distinct from others; any thing spoken; talk, mention; oration, harangue"); *see* NATHAN BAILEY, AN UNIVERSAL ETYMOLOGICAL ENGLISH DICTIONARY (24th ed. 1782) ("speech": "Language, Discourse"); *see also* THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1731 (3d ed. 1992) ("speech": "The faculty or act of speaking," "The faculty or act of expressing or describing thoughts, feelings, or perceptions by the articulation of words," "Something spoken; an utterance," "Vocal communication; conversation"); THE NEW OXFORD AMERICAN DICTIONARY 1630 (2d ed. 2005) ("speech": "the expression of or the ability to express thoughts and feelings by articulate sounds"); 16 THE OXFORD ENGLISH DICTIONARY 175-77 (2d ed. 1989) ("speech": "The act of speaking; the natural exercise of the vocal organs; the utterance of words or sentences; oral expression of thought or feeling").

history and purpose of the First Amendment in according a broad interpretation to the Free Speech Clause. Looking, in part, to the Framers' intent, the Supreme Court has held that the Free Speech Clause applies to written communications, *see City of Ladue v. Gilleo*, 512 U.S. 43, 45, 58 (1994); *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 61 (1983); *Martin v. Struthers*, 319 U.S. 141, 141-42, 149 (1943), as well as a broad range of expressive activities, including spending to promote a cause, *First Nat'l Bank v. Bellotti*, 435 U.S. 765, 767 (1978); *Buckley*, 424 U.S. at 19-20, burning the American flag, *see Johnson*, 491 U.S. at 399-400, 404-06, and dancing nude, *see City of Erie v. Pap's A.M.*, 529 U.S. 277, 289 (2000); *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 565-66 (1991). Furthermore, although the dictionaries do not exclude any particular types of oral communication from the definition of "speech," the Supreme Court has held, in light of the historical context, that the First Amendment does not protect obscene speech, *Roth*, 354 U.S. at 481-85, 488; *Miller v. California*, 413 U.S. 15, 23 (1973), libelous speech, *Beauharnais*, 343 U.S. at 254-55, 266, false commercial speech, *see Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 563-64 (1980); *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 771-72 (1976), or speech that is "likely to cause a breach of the peace," *Chaplinsky v. New Hampshire*, 315 U.S. 568, 569, 573 (1942).

Of course, this court cannot know whether the traditional historical analysis would have resonance with the Supreme Court in a Petition Clause claim such as appellants have brought. It remains to be seen whether the Supreme Court would agree to entertain the issue, much less whether it would agree with appellants and "most scholars" that the historical evidence provides insight into the First Congress's understanding of what was meant by the right to petition and reevaluate its precedent, or conversely reject that analysis in

light of other considerations, such as the nature of our constitutional government. No doubt it would present an interesting question. For now it suffices to observe that appellants' emphasis on contemporary historical understanding and practices is consistent with the Supreme Court's traditional interpretative approach to the First Amendment.